RICHMOND MINING COMPANY *v.* EUREKA MINING COMPANY.

E. and R., two mining companies, in settlement of the differences between them respecting the possession of certain ground and the ores therein contained in the Eureka Mining District in Nevada, entered into an agreement establishing between specified points on the earth's surface a boundary line between their respective claims, and stipulating that E. would convey to R. all the mining ground and claim lying northwesterly of said line, including "all veins, lodes, ledges, deposits, dips, spurs, and angles on, in, or under the same contained," and that R. would convey to E., with a covenant of warranty against its own acts, all its right, title, and interest in and to any and all the land or mining ground situated on the southeasterly side of said line, and in and to "all ores, precious metals, veins, lodes, ledges, deposits, dips, spurs, and angles on, in, or under the said land or mineral ground." The agreement further declared that it was the object and intention of the parties to confine the workings of R. "to the northwesterly side of the said line continued downward to the centre of the earth." *Held,* that the agreement must be construed as extending the boundary line downwards through the dips of the veins or lodes wherever they may go in their course towards the centre of the earth.

ERROR to the Circuit Court of the United States for the District of Nevada.

This is a suit in ejectment brought by the Eureka Consolidated Mining Company against the Richmond Mining Company of Nevada to recover the possession of a valuable mining property.   The facts appearing in the findings, which, in the opinion of the court, are decisive of the case, may be stated as follows : —

In Ruby Hill, a spur of Prospect Mountain, in the Eureka Mining District, Nevada, is a zone of limestone, running in a northwesterly and southeasterly direction for a distance of a little more than a mile.   Underlying this zone, on the southerly

side, is a well-defined unbroken foot-wall of quartzite, several hundred feet thick, and with a dip to the northward of about forty-five degrees. On the northerly side is an overhanging wall or belt of shale, also well defined and generally unbroken, which dips at an angle of about eighty degrees, and varies in thickness from less than an inch to seventy or eighty feet. At the easterly end of the zone these walls of quartzite and shale approach so closely as to be separated only by a seam less than an inch in thickness. From this point they diverge until on the surface, at the Eureka mine, they are about five hundred feet apart, and at the Richmond about eight hundred. At some depth below the surface they must come together if they continue to descend on the same angle, and, on some of the levels that have been worked, they are already found to be only from two to three hundred feet apart. This zone of limestone, at some time since its original deposit, has been broken, fissured, and disintegrated in all directions, so as to destroy, except in a few places of a few feet each, all traces of stratification. In this way its original structure and character became totally changed, and it was fitted to receive the extensive mineral deposits which are found in the numerous fissures, caverns, and cavities, and in the loose material of the rock, in various forms. Sometimes the mineral appears in a series or succession of ore-bodies, more or less closely connected; sometimes in apparently isolated chambers, and again in small bodies and in scattered grains. Although barren limestone intervenes, the mineral is so generally diffused throughout the zone as to render the whole mineralized matter metal-bearing rock. Bodies of ore appear in croppings on the surface at various points throughout the whole length of the zone, along which mining claims have been located. No mineral has been found either in the quartzite or the shale, and no considerable indications of any have been discovered within a mile north or south of the limestone.

In 1864 the miners of the district adopted a system of laws and regulations for their government. At that time provisions were made for ledge locations only, and in February, 1869, it was found necessary to add some amendments to meet the requirements of the district. This was done by a resolution which contained a preamble as follows: —

" Whereas, explorations have made it evident that the mineral in Eureka District is found more frequently in the form of deposits than in fissure-veins or ledges, and the laws of the district do not provide for the location of such deposits; and whereas, the deficiency in the law may give rise to expensive litigation, . . . the miners of Eureka District have adopted the following amendments to the old laws of the district."

The amendments were to the effect that deposit claims might be located; that a deposit claim should consist of a piece of ground one hundred feet square, and be designated as a " square; " that under certain circumstances such claims might be united; and that the owner should be entitled to all the mineral within his " ground to an indefinite depth."

On the 29th of May, 1869, after this amendment of the miners' laws, there was filed for record in the mining records of the district a " square " location of the Lookout claim, being four hundred feet northerly and southerly and two hundred feet easterly and westerly, that is to say, " one hundred feet on each side of the hill monuments for the centre, and . . . on the north end of Ruby Hill."  On the 20th of September, 1869, notice of a ledge claim, called the Tip-Top, was filed for record in the same records, and on the same day, by other parties, another claim, the Richmond, for " seven locations of one hundred feet square," and seven locations of two hundred feet each, on the Richmond ledge, more particularly described " as located and situated adjoining the Champion claim on the south, and running north from said Champion, and adjoining the claim known as the Tip-Top ledge."  Both the Tip-Top and Richmond claims included " all dips, spurs, and angles." The Tip-Top covered six hundred feet on the ledge and one hundred feet on each side.  The Lookout adjoined the Richmond on the north.

The Eureka company, at some time before April 26, 1871, but at what precise date does not appear, became the owner of the Champion, Nuget, At Last, and Margaret claims.  The Champion, At Last, and Margaret adjoined the Richmond and Lookout on the west.  The Nuget adjoined the Champion, but its westerly line did not extend to the Richmond as originally located.  The At Last adjoined the Champion, and the Marga-

ret the At Last. The Nuget extended to and across the line between the zone of limestone and the quartzite, and the distance across the four claims from the Nuget, on its southerly side, to the Margaret, on its northerly side, is seven hundred feet. It was not found in terms by the court below whether these claims extended the entire distance across the zone between the quartzite and the shale, but as it was found that the width of the zone, at the Eureka mine, was five hundred feet, and at the Richmond eight hundred, the fair inference is that the four claims belonging to the Eureka covered substantially the entire surface of the limestone between the end lines of the Champion extended.

On the 26th of April, 1871, the Eureka company conveyed to the Richmond a triangular piece of ground in the southwesterly corner of the Champion claim, described by metes and bounds, and in the deed the following provision was made:—

"But it is expressly understood and agreed that this deed does not convey or quitclaim or release any ores, precious metals, veins, lodes, or deposits, dips, spurs, or angles not embraced within the above-mentioned boundaries, and that the party of the second part [Richmond company] agrees and covenants, for itself, its successors and assigns, to make no claim hereafter to any ground or ore or metals therein embraced within the Nuget, Champion, Lookout, At Last, Margaret, and other mining claims and locations now owned and possessed by the party of the first part [Eureka company], except as to that contained within the limits of the above-described triangular piece of ground."

The Richmond company, in working its mine on the Richmond location, and in following the vein which cropped out on that location, got under the surface of the Lookout, which was then owned by the Eureka company. Controversies arose between the two companies as to their rights under their respective claims, which resulted, on the 16th of June, 1873, in a compromise, by which a dividing line was established, and the Eureka company agreed to convey to the Richmond all the mining ground and claim lying on the northwesterly side of this line, including the Lookout claim, and all veins, lodes, &c., and not to protest against any application by the Richmond com-

pany for a patent for the Richmond or other claims, provided such applications did not cross the line which was fixed. The Richmond company agreed to convey to the Eureka, with warranty against its own acts, all its right, title, and interest in and to the mining ground situated on the southeasterly side of the line, and in and to all ores, precious metals, veins, lodes, ledges, deposits, dips, spurs, or angles on, in, or under the land or mining ground, or any part thereof. Then follows in the agreement this clause: "It being the object and intention of the said parties hereto to confine the workings of the said party of the second part [Richmond company] to the northwesterly side of the said line continued downward to the centre of the earth, which line is hereby agreed upon as the permanent boundary line between the claims of the said parties." The line thus established was described as follows: "Commencing on the northeasterly corner of the Margaret mining ground or claim, . . . running thence in a southeasterly direction along the edge of said Margaret ground, the At Last ground, and the Champion ground, to a point marked W on the map; thence southerly along the edge of said Champion ground to the northeasterly corner of the Nuget ground, and thence along the edge of the Nuget ground to the northwesterly corner thereof." The point W was at the beginning of the triangular piece of ground conveyed by the Eureka to the Richmond in 1871, and from there to the Nuget ground the line was the boundary between that triangle and the Champion.

Deeds were executed to perfect the conveyances contemplated by this agreement, and on the 30th of April, 1874, the Richmond company got a patent for its Richmond claim as surveyed, " embracing a portion of the unsurveyed public domain, with the exclusive right of possession and enjoyment of all the land included within the exterior lines of said survey not herein expressly excepted from these presents, and of five hundred and one and one-half (501½) lineal feet of the said Richmond vein, lode, ledge, or deposit, for the length hereinbefore described throughout its entire depth, although it may enter the land adjoining; and also of all other veins, lodes, ledges, or deposits throughout their entire depths, the tops or apexes of

which lie inside the exterior boundary lines of said survey at the surface, extended downward vertically, although such veins, lodes, ledges, or deposits in their downward course may so far depart from a perpendicular as to extend outside the vertical side lines of said survey: *Provided*, that the right of possession hereby granted to such outside parts of said veins, lodes, ledges, or deposits shall be confined to such portions thereof as lie between vertical planes drawn downward through the end lines of said survey at the surface, so continued in their own direction that such vertical planes will intersect such exterior parts of said veins, lodes, ledges, or deposits."

Before this time, on the 16th of July, 1872, the Eureka company got a similar patent for the Champion claim, and afterwards, on the 12th of December, 1876, for the At Last and the Nuget. This suit was begun on the 27th of March, 1877, and on the 30th of the same month the Eureka obtained a similar patent for the Margaret.

The Richmond company is also the owner of the Arctic and Utah claims, the first filed for record Oct. 4, 1876, and the last, Jan. 7, 1877.

The particular mining ground in dispute is situated within the zone of limestone which has been described, and within planes drawn vertically down through the end lines of the Champion claim as patented to the Eureka company, and within planes drawn vertically down through the extreme points of the patented locations of the At Last and the Margaret claims, at right angles to the course or strike of the zone, and produced so as to follow its dip. The top or apex of the zone is within the surface lines of the patents to the Eureka company, and the zone dips at right angles to its course, and on such a dip extends under the surface of the Arctic and Utah claims. The property also lies on the southeasterly side of the compromise line agreed on in the settlement of June 16, 1873, extended vertically downward so as to follow the dip of the zone. The end lines of the surveys of the At Last and Margaret claims, as patented, are not parallel with each other.

The subjoined diagram represents the surface location of the

respective claims.    The dividing line established by the agree-
ment of June 16, 1873, is that marked X. W. R.

*Mr. Samuel M. Wilson* and *Mr. Thomas Wren* for the plain-
tiff in error.

*Mr. Harry I. Thornton, contra.*

MR. CHIEF JUSTICE WAITE, after stating the case, deliv-
ered the opinion of the court.

Upon the facts set forth in the preceding statement we have
had no difficulty in reaching the conclusion that the judgment
of the court below, sustaining the title of the Eureka company,
was right.   To our minds there cannot be a doubt that the com-
promise line was intended to fix permanently the boundary be-
tween the mining properties of the two companies at that point.
The Richmond was to confine its workings to the north and
west of the line, and the Eureka to the south and east.   The
Eureka had already got its patent for the Champion claim,
which must have been older than the Richmond, for the Rich-
mond location was bounded on the Champion, and by this
patent was permitted to follow throughout their entire depth
all veins, lodes, ledges, and deposits, the tops or apexes of which
came to the surface within the lines of its survey.   It is evi-
dent, also, that the Richmond company was seeking a similar
patent for its Richmond claim, as by the terms of the settle-
ment the Eureka was to withdraw its opposition, and in due
time such a patent was obtained.   The Eureka company also
pushed forward its applications for patents to its other claims,
and in the end got them all in the same form and with grants of
the same privileges.   In this way the companies secured from
the United States the right to work the entire metal-bearing
rock from the quartzite to the shale between the end lines
of their patented surveys extended downwards and following
the dip of the mineralized limestone zone.   Their patents are
all alike and their rights under them the same, save only that
the Eureka is confined in its operations to the southeasterly
side, and the Richmond to the northwesterly side of the agreed
line.

In establishing this line it is to be presumed that the parties
had in view the peculiar character of the property about which

they had been contending. They were settling, as between themselves, their rights to mining property and for the purpose of carrying on mining operations in that locality. They must have known perfectly well from the observations they had already made, that but a small part of the immense mineral deposit in that zone would probably be found between the exposed surface of the limestone and the quartzite immediately underneath. What they wanted was to fix as between themselves their rights in following what is called in the findings "the zone of metamorphosed limestone," so as to reach the anticipated deposits in the depths below. A compromise which only settled their controversies to what was directly under the surface would not have accomplished this. The Richmond wanted to be relieved from all embarrassments in getting under the Lookout, and it is to be presumed the Eureka wanted similar privileges under the surface for the Champion and its other claims. For this purpose the parties had to secure the necessary grants from the United States, and the fair inference from what was done is that the Eureka was not to be interfered with in getting what it could on the south and east of the line, and the Richmond was to have the same privilege on the north and west.

The language used is to be construed with reference to the peculiar property about which the parties were contracting. Whether the limestone was or was not within the meaning of the acts of Congress and the understanding of miners, a single vein, lode, or ledge, it was all mineralized or metal-bearing rock as distinguished from the barren walls in which it was enclosed. It descended into the earth on an angle, and unless parties in working it could follow its course as it went down they could not avail themselves to the full extent of the wealth it contained. When, therefore, we find parties contending about their rights to its possession and finally agreeing on a line of division between themselves which shall be continued downwards towards the centre of the earth, the conclusion is irresistible that the line was to be extended downwards through the property in its course towards the centre of the earth. Anything less than this would make their settlement a mere temporary expedient to get rid of a present difficulty

and leave their most important rights as much in dispute as ever. Such, we cannot believe, was the understanding.

This disposes of the case. The Richmond company is in no condition to dispute the validity of the Eureka's patents; for the At Last and the Margaret because the end lines of the surveys are not parallel, as it has agreed with the Eureka, for a consideration, not to work in the limestone to the south and east of the compromise line. Upon the face of the patents the United States has granted to the Eureka the right to all veins, lodes, and deposits the tops or apexes of which lie on the inside of its surveys as patented, throughout their entire depth and wherever they may go, provided it keeps itself within the end lines of the surveys. The finding that the ground in dispute is within the end lines and that the apex is within the surface lines settles the rights of the parties between themselves as well under their patents as under their compromise agreement.

*Judgment affirmed.*