## No. 15,701.

WALSEN, AS EXECUTOR OF THE ESTATE OF RENSHAW,
DECEASED *v*. GADDIS, TRUSTEE ET AL.
(194 P. [2d] 306)

Decided March 22, 1948.  Rehearing denied May 24, 1948.

Mr. John W. Shireman, Mr. William E. Doyle, for plaintiff in error.

Mr. L. Ward Bannister, Mr. H. Gayle Weller, Mr. Warren B. Hale, for defendant in error Gaddis.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Fred G. Walsen as executor of the estate of William E. Renshaw, deceased, brought an action against Arthur Portenier for damages; to recover possession of certain mining property in Clear Creek county; and for injunctive relief. Judgment was entered in favor of Walsen, to review which Portenier sued out a writ of error and the judgment was affirmed. *Portenier v. Walsen, Extr.,* 112 Colo. 130, 146 P. (2d) 894. While the action was pending in the district court, L. Ward Bannister and J. W. Howell, as trustees, filed therein a petition in intervention, and, upon trial of the issue between Walsen and interveners, judgment was entered in favor of the latter, and plaintiff by writ of error here seeks a reversal of that judgment.

In the petition in intervention it is alleged that L. Ward Bannister and J. W. Howell are the sole surviving directors of the Consolidated Franklin Mines Company, a Colorado corporation, the charter of which has expired, and, by virtue thereof, are the sole surviving statutory trustees of said Colorado corporation and the property thereof. It is further alleged that Portenier, holding a lease or license from Walsen on mining properties belonging to Walsen as executor, which are in close proximity to those of interveners, is trespassing upon interveners' mining claims and mining and extracting

valuable ores therefrom. Interveners seek injunctive relief, and damages for the value of ores alleged to have been wrongfully extracted by Portenier under his lease or license from Walsen.

Portenier answered the petition in intervention, denying generally the allegations thereof, and alleging that subsequent to an adverse judgment entered by the trial court in *Walsen v. Portenier, supra,* he went into possession of the mining property here in dispute by virtue of a sublease from one Joseph Ruth, who, it is alleged, is a lessee of the interveners. Upon motion of plaintiff and interveners, Joseph Ruth was made a party defendant, who, thereupon, appearing by one of the counsel for interveners here, filed his answer admitting the allegations of interveners' petition. Walsen filed his answer to the petition in intervention which, so far as necessary here, may be treated as a general denial.

At the pretrial conference the parties stipulated that:

(1) Walsen, as executor, is the owner of the following lode mining claims, situate in the Idahoe Mining District, Clear Creek county, Colorado:

Washington, U. S. Survey No. 65
Freighter's Friend, U. S. Survey No. 67
Guy, U. S. Survey No. 7441
Gem, U. S. Survey No. 628

(2) L. Ward Bannister and J. W. Howell, as trustees, were the owners of the following mining claims, situated in the district, county and state aforementioned:

Franklin, U. S. Survey No. 73
Mary F. and Oro Fino, U. S. Survey No. 5757

(3) The trial should be to the court without the intervention of a jury.

(4) All maps to be used at the trial should be deposited with the clerk of the district court ten days before the trial for inspection and use by the parties hereto.

(5) Plaintiff's exhibits, being photostat copies of records in the office of the Director of Surveys of the

United States, be admitted in evidence without proof from the custodian of said original records.

With respect to the claims owned by Bannister and Howell as trustees, the following dates were admitted without further proof:

Oro Fino Lode Mining Claim, U. S. Survey No. 5757
Located July 6, 1888
Location certificate recorded September 4, 1888
Patent issued May 18, 1895.

Mary F. Lode Mining Claim, U. S. Survey No. 5757
Located November 8, 1888
Location certificate recorded January 12, 1889
Patent issued May 18, 1895.

Franklin Lode Mining Claim, U. S. Survey No. 73
Located November 3, 1865
Location certificate recorded November 30, 1865
Receiver's receipt issued January 3, 1871
Patent issued May 29, 1871.

Concerning the claims owned by the estate of William E. Renshaw, deceased, the following dates were admitted without further proof:

Washington Lode Mining Claim, U. S. Survey No. 65
Located March 24, 1866
Location certificate recorded March 24, 1866
Receiver's receipt issued August 30, 1870
Patent issued February 15, 1871.

Freighter's Friend Lode Mining Claim, U. S. Survey No. 67
Located September 6, 1866
Location certificate recorded September 6, 1866
Receiver's receipt issued August 31, 1870
Patent issued March 2, 1871.

The Guy Lode Mining Claim, U. S. Survey No. 7441
Located first as XX Lode on March 3, 1892.
Location certificate recorded March 3, 1892
Located as Guy on April 15, 1892
Location certificate recorded April 15, 1892
Patent issued February 6, 1893.

The Gem Lode Mining Claim, U. S. Survey No. 628
   Located August 30, 1875
   Location certificate recorded August 31, 1875
   Relocated July 19, 1876
   Recorded June 19, 1876
   Patent issued December 31, 1877.

After the case was docketed here, Katharine B. Gaddis, trustee, was, by consent, substituted for L. Ward Bannister and J. W. Howell as trustees.

The court adopted intervener's exhibit 1 as the basis of its findings and judgment, a photostat copy of which being:

The court's findings, in part, were:

"3. The Court finds that the ores in controversy which lie along the underground courses 7, 8 and 10 and in the Portenier Winze, referred to in Intervenor's Exhibit I, and which the Intervenor's evidence designated as the Freighter's Friend-Franklin vein, have their apex on the surface of the ground along course 1, 5, 18, 12, 21 and 17, designated on Intervenors' Exhibit I, and that the ores in controversy found underground along courses 9 and 11 (Intervenors' Exhibit I) referred to in the Intervenors' evidence as the Washington-Mary F. vein have their apex on the surface along course 2, 3, 13, 21, 23, 22, 24 and 25 on Intervenors' Exhibit I; that a

68

photostatic copy of Intervenors' Exhibit I is hereto attached.

"4. That the ores in controversy do not have their apex on Washington 65, Gem 628 or Guy 6441 lode mining claims as contended by Plaintiff.

"5. That the Freighter's Friend-Franklin vein is a mineralized vein and is the discovery vein of the Franklin 73; that this vein, on its strike from the west to the east, enters the Freighter's Friend 67 at the southerly side near the westerly end line and continues in said Freighter's Friend 67 until it enters Washington 65 and then enters the west end line of the Franklin 73 and on its course or strike to the east passes out of the end line of the Franklin 73; that from the point that said Freighter's Friend-Franklin vein enters said Franklin 73's west end line until it departs out of the east line of Franklin 73 the apex of such vein and the vein on its strike or course lies entirely within the surface boundaries of the Franklin 73, first as located and secondly as patented.

"6. That the Washington-Mary F vein is a mineralized vein and within the surface boundaries of the Mary F 5757 as patented is the discovery vein of that claim, and on its strike from the west to the east enters the Washington 63 through the west end line thereof, thence runs through said Washington 65 in a northeasterly direction and departs from the south side line of the Washington 65 and enters the Franklin 73 at a point along course 3, 4 of the Franklin 73 at a point approximately 9.35 feet east of the west end line of the Franklin 73; that from the point where said vein enters the Franklin 73 vein on its strike or course to the East and the apex thereof lie entirely within the surface boundaries of the Franklin 73 and the Mary F 5757, first as located and secondly as patented, and belongs to the Franklin 73 and the Mary F 5757.

"7. That the Franklin 73 patent and its extra-lateral rights thereunder and its rights to veins which unite on

their dip relates back to the date of its location as against the later locations of the Washington 65, Freighter's Friend 67, Gem 628 and Guy 6441, and by virtue of its being the earliest location is entitled to all the ores below the point of union of the Freighter's Friend-Franklin and Washington-Mary F veins and that the union of such veins on their dip is the Portenier winze and proximity thereto."

The judgment entered, based on the findings, was:

"3. That the ores in controversy which lie along underground course 7, 8 and 10 and in the Portenier winze referred to in Intervenors' Exhibit I, and which the Intervenors' evidence designated as the Freighters Friend-Franklin vein, have their apex on the surface of the ground along course 1, 5, 18, 12, 21, and 17, designated on Intervenors' Exhibit I, and that the ores in controversy found underground along course 9 and 11 (Intervenors' Exhibit I) referred to in the Intervenors' evidence as Exhibit I) referred to in the Intervenors' evidence as the Washington-Mary F vein have their apex on the surface along course 2, 3, 13, 21, 23, 22, 24 and 25 on Intervenors' Exhibit I; that a photostatic copy with similar colored lines added to match of Intervenors' Exhibit I is hereto attached.

"4. That the segments of the Freighters-Friend-Franklin and Washington-Mary F veins underground that are in controversy herein do not have their apices on the surface within the surface boundaries of the Washington 65, Freighters Friend 67, Gem 628 and Guy 6441, as contended by the Plaintiff.

"5. That the Intervenors, as owners, were and are entitled to mine the Freighters Friend-Franklin vein extralaterally on its dip and along its course underground east of a point where the Freighters Friend-Franklin vein enters the west end line of the Franklin 73 measured by a vertical plane drawn parallel to the west end line of the Franklin 73 which, projected underground, intersects the underground segment of the vein

at a point approximately 46 feet west of the center of the Portenier Winze.

"6. That the Intervenors, as owners, were and are entitled to mine extralaterally on its dip and along its course underground the Washington-Mary F vein east from the point where said vein enters Franklin 73 until such vein leaves Franklin 73 and enters Mary F 5757, which rights are determined by drawing a vertical plane parallel to the end line of the Franklin 73 through the point where the Washington-Mary F vein enters the Franklin 73, which plane projected underground intersects the Washington-Mary F vein at a point approximately 45 feet west of the center line of the Portenier winze.

"7. That the Intervenors, as owners, were and are entitled to mine the Washington-Mary F vein extralaterally on its dip and along its underground course east from the point where the Washington-Mary F vein leaves the Franklin 73 along course 4, 5 of the surface boundaries of the Franklin 73 and enters the Mary F 5757, which rights are determined by drawing a vertical plane parallel to the end lines of the Mary F through the point where the Washington-Mary F vein leaves the Franklin 73 which, projected underground, intersects the underground segments of the Washington-Mary F vein at a point approximately 88 feet west of the center of the Portenier winze; that east of such plane the Mary F has extralateral rights on such underground segments of vein until the same, on its strike to the east, enters the territory included in the extralateral rights of the Franklin 73 on the Washington-Mary F vein.

"8. That the Franklin 73's patent and its extralateral rights thereunder to veins which unite on their dip relates back to the date of its location as against the later locations of the Washington 65, Freighters Friend 67, Gem 628 and Guy 6441, and by virtue of its being the earliest location the Franklin 73 is entitled to all ores below the point of union Freighters Friend-Franklin and

Washington-Mary F veins and of any other veins which join on their dip with the discovery vein of Franklin 73, first as located and secondly as patented. That the union of such veins on their dip is in the Portenier winze and proximity thereto.

"9. That the Washington 65, Freighters Friend 67 and Franklin 73 were all patented under the act of 1866 and the Franklin 73, in not adversing Washington 65 and Freighters Friend 67 when those claims were patented, did not lose its right to assert and had and still has extralateral rights to the underground segments of its discovery vein or any other veins which apex within the surface boundaries of its claim, first as located and secondly as patented."

The court ordered that a motion for a new trial was unnecessary.

During oral argument here, counsel for interveners proposed a modification of the judgment in the following respects, and, with such modification having been made, that the judgment be affirmed:

"That portion of the decree finding and decreeing that the Washington-Mary F vein is the discovery vein of the Mary F claim is modified by eliminating such finding and paragraph 2 of the decree based upon said finding.

"2. The extralateral rights of the Washington U. S. Survey No. 65 and the Franklin U. S. Survey No. 73 on the Freighter's Friend-Franklin vein are measured anew as follows:

"That said Franklin 73 is awarded sole ownership of the apex of Freighter's Friend-Franklin vein easterly of a point on the surface which is 52.5 feet easterly on the west end line of the Franklin 73 and at right angle 50 feet south of the north side line of the Franklin 73 and awards extralateral rights to the Franklin 73 on such vein east of a vertical plane designated by two points on the surface, to-wit:

"Point 1—A point 52.5 feet east of the west end line

of the Franklin 73 and at right angle 50 feet south of the north side line of the Franklin 73.

"Point 2—A point that is 37.5 feet easterly from corner number 2 of the Franklin 73 and on the north side line of the Franklin 73.

"Said Mary F 5757 is awarded sole ownership of the apex of the Washington-Mary F vein east of a point on the surface that is 24.37 feet easterly of corner number 3 of the Franklin 73, and awards extralateral rights to the Mary F 5757 on said vein east of a vertical plane designated by 2 points on the surface, to-wit:

"Point 1—A point 24.37 feet easterly of corner number 3 of the Franklin 73.

"Point 2—A point that is 243.75 feet westerly of corner number 4 of the. Washington 65 which point is on the north side line of the Washington 65."

By some method, undisclosed in the record,. Conrad Schneider acquired title to mining claims 2 to 8, inclusive, westerly on the Franklin lode, and on January 13, 1871, applied for a patent to the same. In connection with his application for patent he filed "the plat and field notes of the survey of the claim" (Franklin) claiming "seven hundred (700) linear feet of the Franklin lode with adjoining mill site for the convenient working of the mine." The plat filed in connection with the Franklin 73 application for patent does not indicate a vein or lode thereon, but it does definitely disclose a conflict or overlapping with the surface area of the Washington 65. The plat further indicates that the Franklin application for patent was made for that part of the Franklin lode only which did not conflict or overlap on the Washington 65, and the patent itself, when issued, expressly excluded therefrom the conflict and overlapping portion on the Washington claim. It read: "The same being exclusive of any portion of the surface as patented to the Chicago and Clear Creek Gold and Silver Mining Company with their claim upon the Washington lode known as Lot No. 65 and also of any

portion of the surface area patented to Joseph F. Hall, with his claim upon the Freighter's Friend lode, known as Lot No. 67, which by the express intent and meaning of these presents to convey unto the said Conrad Schneider and to his heirs and assigns only the seven hundred (700) linear feet of the said Franklin lode hereinabove described."

Schneider's application for patent embraced seven mining claims, i. e., 2 to 8, inclusive, under the "laws for the Government of the [Idahoe] District" each claim could not be greater than 100 feet on the length of the lode and 50 feet in width, so that 600 of the 700 feet applied for in the Schneider patent embraced claims 2 to 7, inclusive, and with only these claims in mind, the westerly end line of the Franklin 73 would be fixed on the extension of a line from corner 4 to corner 5 of the Franklin 73 to the northerly side line of the Franklin 73 claim. The westerly 100 feet square of the Franklin 73 necessarily must have been mining claim No. 8 and millsite. By reference to the map we find the discovery shaft on No. 8 to be in the northerly half of the 100 foot square on the westerly end of the Franklin 73, and, inasmuch as the "laws" then in force in the Idahoe District limited a claim to 100 feet on the lode by 50 feet in width, it must be conceded that the Franklin No. 8 was the northerly half of the 100 foot square and the southerly half to be that portion of the Franklin 73, to which reference is made as a millsite.

We have examined the patent to Washington 65, which was one of the exhibits here. The plat accompanying the patent discloses that the Washington 65 was a full claim 700 feet along the lode and 50 feet in width, with the vein entering the westerly end lines thereof and running parallel with the side lines thereof and passing out the easterly end line of the claim. It also discloses the location of the discovery shaft of the Franklin lode No. 8 within the side lines of Washington 65. There is a discovery shaft near the westerly end line of Washing-

ton 65, and a shaft approximately one third the length of the claim easterly from the discovery shaft. As we have said, the Franklin 73 was located before the Washington 65, but the patent on the Washington 65 was issued prior to that on Franklin 73. When application for patent on the Washington 65 was made, no action was taken by the owners of Franklin 73 to adverse it.

It is conceded by interveners that the discovery shaft on the Franklin No. 8 is within the side lines of Washington 65. It is further conceded that that portion of the Washington 65 and Freighter's Friend 67 from the Freighter's Friend shaft 4 to that portion of the map designated as "gulch" and beyond 18 is entirely covered with a large dump, and that the Portenier winze, so designated on the map, on the sixth level of the Freighter's Friend shaft is approximately 500 feet below the surface and under the dump.

It also is conceded that from the back of the raise so indicated on the sixth level near point 10 on the map, above the Portenier winze, no mining or prospecting work has been done between the back and the surface. It is undisputed that the dip in the location in question is to the north and the strike generally follows an easterly and westerly course. It also is undisputed that two veins on the sixth level of the Freighter's Friend 67 shaft 8 and 10 and 9 and 11 juncture at approximately the Portenier winze.

Interveners, as well as plaintiff, rely largely upon the testimony of expert mining engineers to establish their right to the ore in question.

Interveners' mining engineer, called as a witness, and plaintiff's two mining engineers, called as witnesses, apparently agree that on the sixth level of the Freighter's Friend shaft there is a vein of ore 8, 10 upon which no drift has been opened and also agree that another vein of ore 9 to 11 has been opened by a drift thereon. The mining engineers for both parties are in apparent agreement that the Portenier winze has been sunk at the

junction of the veins 8, 10 and 9, 11. The engineers for both parties made surveys and certain measurements, recorded certain dips, determined the strike or course of the veins on the sixth level, and plaintiff's engineers projected these veins on their dips to the surface to aid them in the location of the apex of these veins and the strike or course of the veins there. Interveners' engineer testified that the vein 8, 10 on the sixth level would apex on the surface by the course indicated on the map as 1, 5, 18, 12, 21 and 17, while the vein designated on the sixth level by course 9, 11 would appear on the surface by course designated 2, 3, 13, 21, 23, 22, 24 and 25. Interveners' engineer also testified as a basis of his opinion that veins 8, 10 and 9, 11 on the sixth level of the Freighter's Friend shaft would appear on the courses herein indicated and that while there was no vein showing at all between the Freighter's Friend shaft and the bottom of the gulch, nevertheless near 13 he found an outcropping which he "thought was the Washington vein. I, however, don't know that it was the Washington vein." This outcrop was about one foot of rotten porphyry and upon the fact that he found this foot of such material and other facts, he assumed that the Washington vein 2, 3, 13, 21 was as coursed through on the map. With reference to the Freighter's Friend vein 1, 5, 18, 13, 21 and 17, this witness testified: "Q. Why do you take an assumed line instead of taking the correct line here that an engineer would take? A. Because that was the only evidence we could find to indicate that the vein went there, in the outcrop. Q. In other words, you were assuming, because this shaft [No. 8] within the lines of the Washington, or which on the old plat is shown to be parallel with the Washington, that was the Franklin and you just drew an apex here to make it fit that vein, is that it, to make it fit that shaft? A. That and the outcrop we found in the gulch. Q. Where is the outcropping, at 13? A. No, at 12. Q. Describe that. A. Similar to 13 but on the other side of the porphyry. Q. Did you

find any other places where there was a streak of soft rock one foot wide? A. No. Q. Did you dig a trench down that gulch to ascertain that? A. I did not. Q. So that you have now established that your apices if drawn from the Freighters Friend to the gulch are purely assumed? A. Not entirely. Q. Well, they are assumed in the sense you have never seen any apex and have never made any calculation from any other underground workings that brings an apex to that point except from the sixth level; is that right? A. Yes.

\* \* \*

"Q. But as I understood your testimony there is no apex here except in the bottom of the gulch you found a streak of soft material one foot wide? A. In the gulch. Q. In the gulch, that is all. A. And using the Franklin shaft there shown by the Washington. Q. So that now we have this whole distance. What is the approximate distance from the Freighters Friend shaft to the Franklin? A. Four hundred and forty feet, approximately, scaled. Q. Your location of the apex, then, on this 440 feet between the Freighters Friend and the Franklin depends upon your finding in the bottom of the gulch two soft streaks of material about one foot wide and the fact that this so-called Franklin No. 8 shaft is shown on the Washington patent; is that right? A. Yes, sir, that is right.

\* \* \*

"Q. Well, your theory is, is it not, that you are able to project this dip [on the sixth level] here from 400 or 500 feet? A. No. I did not say that. I said I followed the vein up the shaft [Freighter's Friend]. I did not say anything about projecting it [the dip] from the sixth level to the surface."

The court based its findings and decree upon Exhibit 1 and evidence relating thereto. Consequently the correctness of the matters appearing on Exhibit 1 is of major importance. This exhibit, it will be remembered, was prepared by interveners' mining expert. The record dis-

closes that some parts of Exhibit 1 are based upon the assumption that other maps, not here properly identified and authenticated, are correct. The junction of the Washington and Freighter's Friend lodes was taken from a map made by one W. H. Wiley, who was deceased at the time of the trial, and was assumed by interveners' witness to be correct without that fact being established. The part of Exhibit 1 easterly from the Portenier winze marked "old winze" was taken from another unidentified map. Point 19, not appearing on Exhibit 1 but appearing on another exhibit, and to which reference was made by interveners' witness and which was used, he testified, in arriving at his opinions as to the apex of the Freighter's Friend lode, was taken from a map of the Gem Mining Company, which was a mine assay plan depicting drifts, crosscuts, raises and winzes, and the assay values therein, but the correctness and authorship of which was not established, and the Gem Mining Company was not a party to the action.

Interveners' witness was asked his reason for his opinion that the Freighter's Friend vein and the Washington vein apexed as indicated on Exhibit 1, the questions and answers being: "Q. Based upon your survey made underground and likewise on the surface and based upon your observances and the notes upon which you drew interveners' Exhibit 1, have you an opinion as to where the vein which is shown at point 10 on Intervenors' Exhibit 1 and between points 7 and 8 on Intervenors' Exhibit 1, has its apex on the surface? Have you an opinion? A. Yes. Q. Would you state that opinion? A. It is my opinion that the vein showing at point 10 is the same vein as shown at point 8; and since the shaft, the Freighters Friend shaft, is sunk on that vein from 7 to 4, I would naturally assume that the collar of the shaft was then on the apex of that vein.

\* \* \*

"Q. No. No. Don't give your reasoning. Just give your opinion where it apexes and then you explain. \* \* \*

A. From point 5 to 12. * * * Q. Now, explain the reason for your opinion that the vein between courses 7 and 8 and as exposed at 10 apexes on the surface at the points between points 5, 12, and 21, as you testified? A. My reasoning is that we followed the vein on the shaft, followed the vein down and come up from down there. We followed the vein back up to the surface where the vein outcrops and then, by tracing the outcrops on the surface should indicate the apex of that vein. Q. From your survey, Mr. Harrington, based upon your observances both underground and on the surface, do you have an opinion as to where the veins that existed underground between points 9 and 11 on Interveners' Exhibit 1 would have their apex on the surface? Do you have an opinion? A. Yes. Q. Whereabouts on the surface in your opinion would that vein apex? A. On the line indicated by points 3, 13, and 21. * * * Q. Upon what do you base your opinion that the veins represented in the sixth level at points 9 and 11 on Intervenors' Exhibit 1 would have their apex on the surface along the course designated, say, points, 3, 15, 21—is that right? A. Yes. Well, the fact that we had the vein on the sixth level. We have a contact on the surface at point 3. And then we have taken from the Gem map a point 19. The three of them line in pretty well to indicate that the Washington would be shown. * * * Q. In your opinion, Mr. Harrington, is the junction point of courses 7, 8, and 10 underground and the junction point of course 9 to 11 underground of Intervenors' Exhibit 1 a continuation of the junction at point 21 on the surface of the Franklin lode mining claim? A. Yes. Q. Did you see the juncture at the 100-foot level on the first level of the Franklin? A. I did. Q. In your opinion is the juncture on the first level of the Franklin a continuation of the juncture of the two veins on Intervenors' Exhibit 1 on the sixth level—that is, vein represented by course 7, 8, and 10 and the vein is represented by course 9 and 11? A. It is my opinion that the same juncture. Q. Now, have

you ever seen any other source that shows any juncture of veins of the like nature—that is, in their strike? A. I have. Q. Where did you see that, sir? A. In the Gem Mining Company map."

The witness testified that he had no personal knowledge of the correctness of the Gem Mining Company map which he had used in forming his opinion; that there was nothing to support his assumption that the drifts depicted therein had been driven on veins, nevertheless he had supported his opinion as to the course of the Washington vein by reference to the Gem Mining Company map. He further testified that he would assume that the mineral surveyor, in making his survey, would show the lode unless it was proven otherwise, and, from an examination of the Washington plat, stated there was a lode line appearing thereon in the center thereof. There was further testimony as follows: "Q. I hand you Plaintiff's Exhibit E which is the Washington. Will you examine that and state whether that shows a lode line through the center of the lode? A. This plat itself shows a lode line through the center of the lode. Q. I hand you the original patent to the Franklin claim and ask you to look at the diagram on the plat therewith. Does that show any lode line through the center of the lode? A. I do not see a lode line drawn on this map."

Plaintiff's two mining engineers testified that they examined the Freighter's Friend shaft, and particularly the sixth level thereof, and found indications of a vein 8, 10 and actually saw vein 9, 11 indicated on Exhibit 1. They further testified that above the Portenier winze there is a very large stope, not shown on Exhibit 1, and further that easterly from the Portenier winze was an accessible old winze broken into from the Portenier winze. These engineers took the dip in the Portenier winze and in the large stope immediately above it and projected it to the surface for the purpose of ascertaining where veins 8, 10 and 9, 11, if continued upward, would apex on the sur-

face. They agree that the Portenier winze occurs at a junction of veins 8, 10 and 9, 11 on Exhibit 1. They testified that the dip in the Portenier winze and in the large stope immediately above it projected to the surface, would be on a vein apexing on the Washington claim in approximately the position of the vein disclosed in the patent to the Washington at a point approximately 100 feet westerly from the Washington's easterly end line. They further testified that the Washington vein was disclosed in a cut about 160 feet easterly from the Washington discovery shaft on Exhibit 1 and that easterly beyond the large dump which covered a part of the Washington 65 there was evidence that the Washington vein passed out of the easterly end line of the Washington claim in the approximate position of the vein disclosed on the plat in the Washington patent.

There are ten specifications of points, all of which may be considered under the contention that the judgment is contrary to the law and the evidence.

The "laws" of the Idahoe District, in which all of the mining claims here involved are located, have no specific provision requiring a discovery shaft on each claim unless it is found in section 34 thereof which reads: "Be it further enacted; That any person or persons discovering a Lode or Lodes shall sink a hole at least Two Feet thereon and stake the same as discovery claim naming the Lode, giving the direction it runs. * * *"

■ ■ We have heretofore stated that there were eight claims located westerly from the discovery shaft of the Franklin lode and eight claims easterly therefrom, we being here concerned only with claims 2 to 8, inclusive. The discovery of mineral bearing rock in place has always been the basis of a mining claim location, and while the statutes of 1866 do not specifically provide for a discovery shaft within the boundaries of each mining claim, as does the statute of 1872, we are persuaded that without such a discovery shaft there is no valid location

and no rights are conferred upon the locators. We are thus persuaded because, under the statute of 1866, before a patent could issue upon a lode claim, it must affirmatively appear that there was mineral bearing rock in a vein within its boundaries. There are a number of decisions to the effect that when the owner of a lode mining claim permits another to secure a patent covering his discovery shaft, by the loss of the discovery shaft the location also is lost. *Gwillim v. Donnellan,* 115 U. S. 45, 5 Sup. Ct. 1110, 29 L. Ed. 348; *Miller v. Girard,* 3 Colo. App. 278, 33 Pac. 69; *Michael v. Mills,* 22 Colo. 439, 45 Pac. 429; *Girard v. Carson,* 22 Colo. 345, 44 Pac. 508; Morrison's Mining Rights (16th ed.), p. 31; 2 Lindley on Mines (3d ed.), p. 784, §338, et seq.

It is conceded that "Franklin No. 8" is within the boundary lines of Washington 65 as patented although Franklin 73 was a prior location. It is also conceded that when application for the patent to Washington 65 was made, the owners of Franklin 73 did not adverse. We have concluded that by reason of Franklin No. 8 shaft being within the boundaries of Washington 65 when patented, the owners of Franklin 75 having lost their discovery shaft, they lost their location, and that, therefore, the title to the westerly 50 by 100 feet of the Franklin 73 passed under the patent to the owners of Washington 65. If for any reason we are incorrect in this conclusion, there is another equally persuasive and convincing reason why Franklin 73 owners are not entitled to any part or portion of the westerly 100 by 50 feet of the Franklin 73 which overlaps the Washington 65. The boundaries of the plat made a part of the application for patent on Franklin 73 are correctly depicted on Exhibit 1. Under the statute of 1866 and as a condition precedent to the filing of an application for patent to a lode claim, the applicant was required to post a copy of his plat in a conspicuous place on the claim together with a notice of his intention to apply for a

patent, and notice of his application for patent was required to be published. It will be observed by reference to Exhibit 1 that when Schneider applied for his patent on Franklin 73 his plat definitely excluded that portion of Franklin No. 8 within the boundaries of Washington 65, and, as we have heretofore shown, the patent itself when issued expressly and specifically excluded that portion of the Franklin 73 in conflict with both Washington 65 and Freighter's Friend 67. Schneider in his application made no claim to that portion of Washington 65 which conflicted with Franklin 73 and therefore either abandoned the conflict or waived all right thereto. The patent issued to Schneider on Franklin 73 granted him all that part of the Franklin lode to which he laid claim and did not include that part or portion of the lode previously patented to Washington 65. We are supported in our conclusion that the owner of Franklin 73 was not entitled to claim any portion of its conflict with Washington 65 by the decision in *Larned v. Jenkins,* 113 Fed. 634, wherein it is said:

"Prior to the issue of the patent to the town site the grantor of plaintiff in error had located his claim to the Cook lode upon a tract of land 790 feet long and 50 feet wide, had marked the exterior boundaries of this claim, had entered it and received a patent for it. These acts constituted a notice to the government and to the public that he was the owner of all the exclusive rights and privileges in this tract of land, and in the lode or vein therein, granted by the act of July 26, 1866, under which he located and entered the land. But it was also a notice, and a legal notice, to the government and to the public that he renounced and abandoned all other rights and privileges pertaining to the discovery of his lode which he did not secure by his patent. When he had discovered his vein, he had the right to locate it, in conformity with the local laws, customs and rules of miners, upon that portion of this vein which is within the tract

conveyed to the city of Central. Until he made his location he was entitled to follow the course of the vein. He chose to locate his claim and to take his patent upon a tract which excluded that portion of the lode within the territory now in dispute. His grantee now asks to renounce this location, and the limitations of the law and of the patent upon which it is based, and to follow the lode wherever it leads, as the discoverer might have done before he located and marked the boundaries of his claim. The action of his grantor has forever estopped him from pursuing this course. A discoverer of a vein cannot be permitted to locate his claim, present his diagram, and obtain a grant for the lode and the land he claims, and then disregard the limitations of the grant and follow the lode without his location wherever it happens to lead. One who discovers and locates a lode mining claim under the act of 1866 thereby renounces and abandons all rights and privileges to follow his lode on its course beyond the exterior lines of his patented claim, when he locates it upon the surface of the ground, enters it, and accepts a patent for it under the law. [citing cases.]

"The position of counsel for plaintiff in error, that because the act of 1866 permits the discoverer of a lode to receive a patent therefor, 'granting such mine together with the right to follow such vein or lode with its dips, angles and variations to any depth although it may enter the land adjoining,' the locator has the right to follow the lode on its strike beyond the boundaries of his location, is not tenable. It is only in its descending course that he may follow its dips, angles, and variations. He cannot follow these dips, angles, and variations 'to any depth' on the strike of the vein, or on its ascending course. The words 'to any depth' as well as the other provisions of the statute which require the locator to file a diagram of the tract he claims, and permit him to receive a patent of this limited area, demonstrate the fact

that it was not the intention of congress to grant to the patentee of a lode mining claim under the act of 1866 the right to follow it on its strike beyond the boundaries of the location he selects and secures. The act of July 26, 1866, does not grant to the patentee of a lode mining claim the right to follow his vein on its strike, with its dips, angles and variations, beyond the boundaries of his location. It permits him to follow it beyond those boundaries on its dip or descending course only. * * *"

To the same effect: *Del Monte M. & M. Co. v. Last Chance M. & M. Co.*, 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72; *Richmond M. Co. v. Eureka M. Co.*, 103 U. S. 839, 26 L. Ed. 557; *Wolfley v. Lebanon M. Co.*, 4 Colo. 112; *Lee v. Stahl*, 9 Colo. 208, 11 Pac. 77; *Davis v. Shepherd*, 31 Colo. 141, 72 Pac. 57; Costigan on Mining Law, p. 17; 1 Lindley on Mines (3d ed.), p. 100, §60.

By the failure of the owner of the Franklin 73 to adverse the Washington 65 patent, and by his application for a patent excluding that part of their mining locations in conflict with the Washington 65 and the acceptance of a patent therefor, he is now precluded from asserting any right to that portion of the Franklin-Freighter's Friend vein within the boundaries of Washington 65, and, further, his extralateral rights on the Franklin vein are limited to the vertical plane extended through its corners 4, 5 and the northerly side line of said claim.

Assuming Interveners' Exhibit 1 correctly portrays the boundary lines of the conflicts between the Washington 65, Freighter's Friend 67 and Franklin 73, as did the district court, we reach this conclusion: That inasmuch as the Washington vein passes out of the Washington into the Franklin at about corner 3 of the Franklin, the extralateral rights on the Washington claim would be measured by a vertical plane drawn through the point of departure from the Washington claim parallel to its end line, and this would not include the Portenier winze. Still assuming the correctness of Exhibit 1, the Freighter's Friend lode passes out of the boundary lines of

Freighter's Friend 67 at point C, and the extralateral rights thereof would be measured by a vertical plane parallel to its end line, and this would not entitle the owners of Freighter's Friend 67 to the ore in the Porte-nier winze. We have concluded that the westerly end line of Franklin 73 is on a line passing through corners 4, 5 to the northerly side line of Franklin 73, and the extralateral rights on the Franklin vein would be meas-ured by a vertical plane extended through Franklin cor-ners 4, 5 and the northerly side line thereof, and this, too, would exclude the ore found in the Portenier winze. The trial court found that the Mary F had its discovery shaft on, the Washington vein. Both parties concede that in so finding the court was in error, and from an examination of the record we have reached the conclu-sion that there is no evidence to support the court in this finding. If it be conceded that the Mary F 5757, having been patented under the 1872 statute, its owners are entitled to extralateral rights on all veins apexing within its area, they would be entitled to extralateral rights upon that portion of the Washington vein meas-ured vertically by a plane drawn through the point where the Washington vein leaves the millsite of the Franklin 73 and another vertical plane drawn through the point where it reenters the Franklin 73, both planes being parallel to the Mary F end line, in which event it too would not encompass the Portenier winze.

█ The Idahoe Mining District "laws" contained no provision for the location of a millsite, and, until 1872, there was no federal statute by which title thereto could be obtained. 2 Lindley on Mines (3d ed.), p. 1172, §519. In *Cleary v. Skiffich*, 28 Colo. 362, 65 Pac. 59, a contro-versy arose over the area in conflict between a lode claim located in 1895 and a millsite located in 1860. Para-graph 3 of the syllabus, which correctly states the hold-ing in the opinion, reads: "A millsite cannot be located and patented upon mineral land containing valuable mineral, whether such millsite be located and patented

in connection with a lode claim or whether it be located by a person not owning a mine in connection therewith."

As we have assumed, and it seems to be conceded, the southerly 50 by 100 feet of the westerly 100 feet square of the Franklin 73 was a millsite, and, if the owner is entitled to any mineral rights, he is not entitled to extralateral rights. 2 Lindley on Mines (3d ed.), p. 1255, §567.

Consequently, based upon the assumption that Exhibit 1 is correct, we conclude that neither the owners of Washington 65, Freighter's Friend 67, Franklin 73, nor of Mary F 5757 have, under the evidence here, established any claim to the ore in the Portenier winze by reason of any extralateral rights to which any of them is entitled.

The interveners had the burden of proving that the Portenier winze is on mining property belonging to them. This they failed to do, and the evidence is likewise insufficient to authorize our determination that the plaintiff has established his right to the ore in the Portenier winze.

■ Counsel for interveners have suggested a modification of the judgment entered herein, and that, if the modification is made, the judgment be affirmed. One may search the record here without finding therein sufficient evidence which would enable or justify us to make the modification as suggested by counsel, even though we were inclined so to do.

■ Our disposition of this case is such that another trial may result, and in that event it may be assumed that we have adopted and approved Exhibit 1. This is not the fact. We have said that the judgment herein was based upon Exhibit 1 and the evidence introduced in connection therewith. This exhibit was prepared by interveners' engineer, and in its preparation he assumed the correctness of other maps and plats and based his opinion upon such assumption. The authorship and authenticity of these other maps and plats was not properly estab-

lished by any evidence on the trial of the cause. Because entirely covered by a large dump, in preparing Exhibit 1 the engineer assumed the correctness of the indicated location of Freighter's Friend vein from the collar of the Freighter's Friend shaft to beyond point 18 on that vein without any evidence to support this assumption unless it was that about point 12 in Freighter's Friend-Franklin vein he found a foot of rotten porphyry, which in nowise identified the Freighter's Friend vein; likewise his assumption as to the Washington 65 vein. Neither interveners' engineer nor any other witness definitely identified either the Washington 65 or the Freighter's Friend 67 vein at points 12 and 13. Nor did the engineer or any other witness for interveners testify that the Washington 65 vein did not enter its westerly end line and extend through the Washington 65, passing out the easterly end line thereof as indicated on the Washington patent, although interveners' engineer stated he would assume "the mineral surveyor, when making his survey, is supposed to follow the lode, and I would assume that the party who made this survey followed the lode until it was proven otherwise." Yet, as to the Washington 65 vein, as shown in the patent, and there was no proof otherwise, the engineer failed to indulge in the assumption which he stated he would follow. Interveners' engineer testified that in the preparation of Exhibit 1 he used the Gem Mining Company assay plan map and a map prepared by an engineer since deceased; that, without any evidence to support his conclusion, he assumed their correctness, and upon this assumption based, in part, his opinion. The Gem Mining Company was not a party to this litigation, and this map was not binding, effective or admissable in this action between interveners and plaintiff unless there was competent evidence as to its correctness. Interveners' engineer based his opinion in part upon the assumption that the Gem Mining Company map and the map of the engineer now deceased was correct. The junction of the Washington-Freighter's

Friend vein is ascertainable, and the establishment of the mining developments in the Gem Mining Company property which interveners' engineer considered of importance in arriving at his opinion, present no insurmountable obstacle. Exhibit 1 should be the result of the engineer's own effort and observations and could then be the basis for his opinions; otherwise not. Under the evidence here it was improper to admit in evidence the map of the Gem Mining Company, and Exhibit 1 was not sufficiently identified to be admissable in evidence. The Gem Mining Company map had no probative value, and, without further proof, Exhibit 1 was improperly considered.

The judgment is reversed and the cause remanded, each party to bear his own costs incurred in this court.

MR. JUSTICE STONE does not participate.