[Civ. No. 6622. Fourth Dist. Dec. 13, 1961.]

DORA PEPPERDINE et al., Plaintiffs and Respondents, v. WILLIAM F. KEYS et al., Defendants and Appellants.

Marsh & Moore, Lonergan & Jordan and John B. Lonergan for Defendants and Appellants.

Burr & Smith, George W. Nilsson, Wendell P. Hubbard, Ernest W. Pitney and Philip Grey Smith for Plaintiffs and Respondents.

SHEPARD, J.—This is an appeal by defendants from a judgment quieting title in plaintiffs as against defendants to certain mining claims.

By their complaint plaintiffs asserted title to certain placer mining claims named Palen Gypsum Mine Numbers 1-13 inclusive. Each of the claims contains approximately 160 acres or a total for all 13 of about 2,080 acres. Certain of plaintiffs also claimed title to other claims named Palen Mountain Claims Nos. 14-16 inclusive containing about 80, 160 and 80 acres respectively, or a total of about 320 acres. Defendants admitted they claimed title to plaintiffs' land and denied plaintiffs' title, setting up certain special defenses. By cross-complaint defendants claimed title to 24 claims filed by them in the years 1955, 1956 and 1957, generally overlapping much of the same area covered by plaintiffs' claims. Defendants' claims are named Snow White Gypsum No. 3, West Snow White, Anhydride Gypsum Placer, Anhydride Placer Nos. 1-4, inclusive, Sheeptrail, Sheeptrail Nos. 1-4, inclusive, General Patton and General Patton No. 1. Cross-defendants answered and denied cross-plaintiffs' title.

## FACTS

The record before us shows the facts, in general substance, to be as follows: The property involved lies in the barren desert area of northeastern Riverside County, about 60 airline miles northeasterly from Salton Sea. The topography shows low eroded hills rising, at the point where the claims are located, a few hundred feet above the surrounding desert, at an altitude ranging from 1,250 to 2,000 feet above sea level.

The original locators named in the recorded claims of July 12, 1934, were George and H. L. Pepperdine, F. M. Crosby, E. L. Thurston, E. J. and L. C. O'Shea, D. V. and E. W. Steed. Other plaintiffs are the successors in interest by conveyance or lease to all or some part of the interest of one or more of the original locators.

After the original filing and commencing with the year 1936, proof of annual assessment work on each claim was duly filed as provided by law, except that in some of the war years of the 1940's, when the law so permitted, there was filing of a notice of election not to perform assessment work. Further evidence hereinafter outlined showed extensive physical work of improving, protecting, monumenting, surveying, mining and removing of gypsum from the claims. Evidence was also received that the original monuments and posted notices were partially destroyed prior to the end of World War II. It was generally known that the United States Army Tank Corps was trained over that area by General Patton preparatory to the later engagements in the Northern Sahara Desert. Tank tracks and group holes classified by one witness as "fox holes" were seen over various parts of the claims. One witness, Steed, had been on the claims in 1938 and had seen some of the monuments, excavations and roads. John Webb was evidently on the claims then, for he pointed out some of the monuments to Steed. In 1948, a mining consultant for plaintiffs made physical surveys to advise plaintiffs on mining methods and economic values. In that year claims were worked with heavy equipment including a bulldozer with a 12-foot blade, trucks and loaders. From 16 to 17 miles of approach road were built for the benefit of all claims. Numerous cuts, trenches and pits 3 to 5 feet long were dug. In 1949 a mining engineer was on the property intermittently and he and other workmen assisting him repaired and replaced monuments and notices, surveyed and redelineated claims and repaired roads. In that year about 1,000 tons of gypsum were taken out by plaintiffs' workmen. Again, several months were spent using an H-10 Allis Chalmers bulldozer with a 12-foot blade, along with other heavy equipment, bulldozing, trucking out gypsum and repairing roads. Plaintiffs' workmen went in with heavy equipment during the years 1950, 1951, 1952, 1953, 1954, 1955, 1956, 1957 and 1958. During all these years the workmen of plaintiffs or their lessees continued to repair and extend the roads, replace monuments and notices, strip the overburden from various portions of claims to expose commercial gypsum and to mine and remove the gypsum itself. The record does not clearly show the exact tonnage of the gypsum removed, but an examination of all the testimony would have justified a conclusion by the trial court that several thousand tons were removed. Some of the witnesses who worked on the

claims during the period defendant William F. Keys claims he was there state they never saw him. One of the witnesses, who constructed a road for plaintiffs on a portion of the claims, went back to the claim property a few months later and found on the road which he had constructed a sign stating, "This road work was done by William F. Keys."

In the meantime, by his own testimony, defendant William F. Keys visited the claims of plaintiffs during the years 1948, 1949, and 1950 as the friend and guest of John Webb. Webb was on the claims as the representative of plaintiffs, and Keys knew that. Webb showed Keys around over the claims, pointing out the location of gypsum deposits. Keys saw bulldozer work being done. He knew Arthur Kintano, for plaintiffs, worked on 16 or 17 miles of road on the west end and some on the east. Webb died apparently in the fall of 1952, although the record is not clear whether it was 1951 or 1952. Mrs. Lino Cooper Webb, one of the plaintiffs herein, is the widow of John Webb. Taking advantage of the knowledge thus gained through the friendship and hospitality of John Webb, Keys in 1953 went back to the claims and attempted to file two claims, called Snow White Nos. 1 and 2 (later called General Patton and General Patton No. 1). On this attempted location of 1953, Keys, without the permission or authority of Mrs. Webb, used her name as a co-locator. However, these claims were abandoned by him after Mrs. Webb discovered his attempt to use her name and the claims upon which his cross-complaint is filed are all dated in the years 1955, 1956 and 1957.

There is conflicting evidence as to placement, replacement, destruction and repair of monuments at various times. Keys asserts no work was done after the death of Webb and before he, Keys, made his locations. Keys and plaintiff Phillips met on the claims in 1956 but there was some disagreement between them as to what occurred at that time. In June 1956, Donovan Phillips saw Keys on the claims and told Keys that he, Phillips, held the claims under a lease from plaintiffs. All but two of Keys' claims were filed after that date. Keys admits he saw Phillips doing bulldozer work on the claims in 1958 and ordered him off. Keys at that time had a heavy caliber rifle and revolver, inferentially threatening Phillips. Keys, on cross-examination, admitted that he saw people in 1953 on the claims he later located as Anhydride No. 1 but he did not know who they were.

## Evidence Sufficiency

The first error claimed by defendants is that the evidence was insufficient as a matter of law to support the findings and judgment. ▮▮ While there is considerable direct and inferential conflict in the evidence the rule that on appeal this court must view the evidence and all inferences and presumptions that may be reasonably drawn therefrom in the light most favorable to the judgment is too well settled to admit of discussion. (*Brewer* v. *Simpson*, 53 Cal.2d 567, 583 [1-2] [2 Cal.Rptr. 609, 349 P.2d 289].)

## Evidence of Assessment Work

Public Resources Code, section 2303, provides for the posting of notices of location, marking of boundaries, and that if a United States survey exists the description may be by legal subdivision without marking or staking the boundaries. Section 2313 provides for recording a copy of the notice and the statement of marking of boundaries and discovery work. Section 2313 also provides for recordation of proofs of annual assessment work. By sections 2322 and 2323, records of the location of a mining claim filed in the office of the county recorder and certified copies of all instruments of record under the provisions of sections 2303, 2313 and 2315 are receivable as evidence under the same circumstances and rules as are provided by law for using instruments relating to real estate. (*Ames* v. *Empire Star Mines Co., Ltd.*, 17 Cal.2d 213, 225 [15] [110 P.2d 13]; *Kirkpatrick* v. *Tapo Oil Co.*, 144 Cal.App.2d 404, 412 [6] [301 P.2d 274].)

▮▮ By section 2315 the affidavit of assessment work is prima facie evidence of the performance of such work or improvement. The form and fact of filing of proofs of assessment work are not challenged by defendants, thus the findings of the court, are, in part, substantially supported both by oral testimony and by the certified copies of the affidavits of doing assessment work. (*Sampson* v. *Page*, 129 Cal.App.2d 356, 361 [2] [276 P.2d 871]; *Ehrhart* v. *Bowling*, 36 Cal. App.2d 503, 508 [5] [97 P.2d 1010]; *Pidgeon* v. *Lamb*, 133 Cal.App. 342, 346 [24 P.2d 206]; *Musser* v. *Fitting*, 26 Cal. App. 746, 750 [3] [148 P. 536].)

▮▮ ''Abandonment is never presumed, but must be made to appear affirmatively by the party relying thereon.'' (*Group Property, Inc.* v. *Bruce*, 113 Cal.App.2d 549, 559 [6] [248 P.2d 761].) ▮▮ It makes no difference which of the group

of plaintiffs did the work, if it was done for the benefit of all the claims it is as efficacious as though all owners had been present. (*Crane* v. *French*, 39 Cal.App.2d 642, 656 [16-17] [104 P.2d 53]; *Smith* v. *Daly*, 181 Cal.App.2d 154, 159 [6] [5 Cal.Rptr. 176].)

██ From an examination of the certified copies of proof of annual work after the original location notice, we are satisfied that the trial court, from that evidence alone, would have had sufficient evidence to support a finding of fact that all required annual assessment work was in fact done, since section 2315 of the Public Resources Code provides that the affidavit of work performed ''shall be prima facie evidence of the performance of such labor or the making of such improvements, or both.''

██ Moreover, aside from prima facie evidence, there was direct testimony of observed monuments, road building, resurveying, monument repairing, stripping the overburden, mining and removal of gypsum, water well drilling and stock piling. The sum total of the gypsum actually hauled is not shown by the record but it is clear, as above noted, from analysis of the testimony of what was done in each of the years that the trial court would have been justified in believing that the total removed aggregated several thousand tons.

Thus the effect of the prima facie proofs from affidavits and voluminous testimony from more than a dozen witnesses was amply sufficient to warrant a trial court finding that plaintiffs had openly, notoriously, continuously and under claim of right been in possession through their predecessors in interest, their lessees, or their employees, for a period of 22 years or more prior to 1959, and most certainly during the 11 years from 1948 to 1958, inclusive. We find no merit in defendants' contention that the evidence is insufficient to show continuous working of the claims by plaintiffs.

██ The case of *Cole* v. *Ralph*, 252 U.S. 286 [40 S.Ct. 321, 64 L.Ed. 567] cited by defendants turned on conflicting testimony regarding discovery, continued working, and possession. It is not helpful to defendant. On the contrary it points out that the purpose of the Congressional Act (cited therein as Rev. Stat., § 2332) allowing patent upon proofs of continuous possession and working over the period required by local adverse possession statutes, was to lessen the burden of proving location and transfers of old claims concerning

which the possessory right was not disproven. This is the precise situation in the case here at bar.

Here the sum total of the evidence clearly shows that discovery had been made more than 24 years before the action was commenced. Plaintiffs and predecessors in interest and their lessees had done valuable work in development and mining during most of these years and continuously for the last 11 years before suit was filed. Some of the original locators were dead. Some had lost their power of memory and the sum total of all the evidence leaves the clear impression that those who remained alive were subject to the memory deficiencies of advanced years. The very thing contemplated by said section and referred to in *Cole* v. *Ralph, supra,* took place here. ▮ Questions of good faith and actual possession resting on conflicting evidence were properly matters of fact lying within the province of the trial court. (See also *McLean* v. *Ladewig,* 2 Cal.App.2d 21, 27 [10] [37 P.2d 502] ; *Lind* v. *Baker,* 31 Cal.App.2d 631, 633 [1] [88 P.2d 777] ; *Hess* v. *Moodey,* 35 Cal.App.2d 401, 405 [2] [95 P.2d 699] ; *Phelps* v. *Pacific Gas & Elec. Co.,* 112 Cal.App.2d 558, 563 [3] [246 P.2d 997].)

### Actual Possession

▮ Defendants assert next that there was only constructive possession and that the actual possession required was not present. We think this contention is without merit. Defendants' first real knowledge of the claims came through defendant William Keys. Through him defendants knew that Keys had visited John Webb as John Webb's guest on the property in the three or four years of 1948, 1949, 1950, and possibly 1951, and that Keys' knowledge of the mineral content of the claims was primarily derived from the hospitality of Webb toward Keys. They knew that plaintiffs' claims had been actually occupied and worked for many years prior to 1952, the year of John Webb's death. By his own testimony, Keys was shown the sign, ''Palens 1-3—No Trespassing'' (Keys said it read, ''Claim from 1 to 13, 160 acre claims'') on the road entering the claims.

Remington Stone was on the property in 1949 during several months with his helpers, Kintano and Ward and others, doing the work of resurveying, re-monumentation and mineral analysis. He testified his total actual work was about six to eight weeks and amounted to about 300 hours of his own time. His extensive field notes of his survey and work

and his maps were all placed in evidence. He testified he found many of the older monuments by his survey and by observation. N. P. Browne, Deputy United States Mineral Surveyor, testified that he surveyed the claims and located established monuments in November and December of 1950, for plaintiffs. Wesley Waldrup testified to extensive work on the claims with heavy equipment in the years 1948, 1949, 1950 and 1951, and that he observed work by others in 1952 and 1953. Arthur Kintano testified to many months of work on the property in bulldozing, hauling and in assisting Stone in surveying during the years of 1948 to 1951, inclusive. Donovan Phillips testified to extensive road work, blasting, mining gypsum, and taking in many representatives of other companies for mineral inspection during the years 1955 and 1956. Frank R. Wicks testified to inspection and geological and mineral survey work in 1940 and in 1948 and 1949 and to seeing monuments and repair and rebuilding thereof and to seeing adits, cuts and stripping of gypsum in those years. Roy E. Kitching testified to extensive work done or seen by him in 1952, 1953 and 1954. Elmer C. Peterson testified to extensive work in the years 1955, 1956, 1957 and 1958. Much of the testimony thus received, if believed by the trial court, seriously impaired the contention of Keys that he did not know plaintiffs were in active possession mining the claims. The trial court was not compelled to believe all Keys' testimony. Under such circumstances, Keys' attempted location of the claims could create no valid rights in defendants. (*Ring* v. *United States Gypsum Co.*, 62 Cal.App. 87 [216 P. 409]; *Lind* v. *Baker, supra*; *Judson* v. *Herrington*, 71 Cal.App.2d 565, 569 [4] [162 P.2d 931].)

## GROUP CLAIMS

Next, defendants assert that the evidence was insufficient to show work on each claim. We are unable to ascribe merit to this contention. Some 16 to 17 miles of road work in original construction and in repair in successive years required the use of expensive heavy equipment and an analysis of all the evidence clearly shows that such work was for the benefit of all the claims. In addition, extensive road work was shown elsewhere on the claims. Much of the other evidence was similar. In addition, of course, there was the prima facie evidence presented by the recorded affidavits of work done. Where group claims are recorded for the benefit of all, such work inures to the benefit of each claim. (*Ring* v. *United*

*States Gypsum Co., supra*; *O'Reilly* v. *Balkwill*, 133 Colo. 474 [297 P.2d 263] ; *Lind* v. *Baker, supra,* p. 639.)

## "Placer" Versus "Lode"

 Defendants next contend that the trial court was in error in concluding that the area involved was "placer" in character and assert the claims of plaintiffs are fraudulent efforts to avoid "lode" locations. With this contention we cannot agree. Title 30, United States Code Annotated, section 23, provides for the location of claims on veins or lodes without specifically describing what is meant thereby. Section 35 of the same title provides for location of placer claims, stating that "Claims usually called 'placers,' including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent."

The original location notices of both parties hereto describe the claims as "placer," although Keys did this through the use of a "lode" form in which he struck out the word "lode" and substituted the word "placer." During the trial of this action in 1959 defendants posted new notices denominated amended notices in "lode" form but claiming the benefit of the original notices.

Under many varying types of situation the courts of the United States have from time to time attempted to define or explain the differences between lode and placer claims. The statement made by Mr. Justice Field in the early *Eureka* case, *Eureka Consol. Min. Co.* v. *Richmond Min. Co.,* 4 Sawy. 302 [F. Cas. No. 4548], is quoted with approval in *Iron Silver Min. Co.* v. *Cheesman,* 116 U.S. 529 [6 S.Ct. 481, 483 [3], 29 L.Ed. 712], and in many other cases. He states [6 S.Ct.],

"It is difficult to give any definition of this term as understood and used in the acts of congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to a lode in the judgment of geologists. But to the practical miner the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock lying within any other well-defined boundaries on the earth's surface, and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term as used in the acts of congress is applicable to any zone or

36

belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock.''

In the same case, at page 485 [6 S.Ct.], the court approved the statement, ''. . . A continuous body of mineral or mineral-bearing rock, extending through loose and disjointed rocks, is a lode as fully and certainly as that which is found in more regular formation; but if it is not continuous, it cannot be called by that name. In that case it lacks the individuality and extension which is an essential quality of a lode or vein. . . .

''The defendants sought to show that the ground is broken and disjointed, and the several parts so intermingled that no lode can extend from one claim to the other. It is a question to be decided by the weight of testimony rather than the number of witnesses; upon the effect which the testimony has on your minds, accepting that which seems to you to be worthy of belief, and rejecting the other. . . .''

■■■ As was said in *Titanium Actynite Industries* v. *McLennan*, 272 F.2d 667, 670 [2-3], ''There can be no unyielding rule of thumb definition of a vein or lode; each case must be decided with reference to its own peculiar facts.'' And the court goes on to quote from other authorities, '' 'Thus the two essential elements of a lode are (a) the mineral-bearing rock, which must be in place and have reasonable trend and continuity, and (b) the reasonably distinct boundaries on each side of the same.' '' (See also Lindley on Mines, vol. 1, (3d ed.) § 289; *Gregory* v. *Pershbaker*, 73 Cal. 109, 111-114 [14 P. 401]; American Mining Law, California Natural Resources Department, vol. 1, pp. 140-141.)

■■■ With these principles in mind, an analysis of the evidence shows that the trial court was fully justified in believing that in the area here involved, a gypsum deposit covered about 5 square miles; that the formation involved an intricate folding, faulting, brecciation, metasomatic and hydrothermal metamorphism, cataclistic deformation and igneous intrusion, presenting a picture of extreme complexity, probably deposited originally by marine dehydration under arid conditions in a broad shallow basin of a continental platform. Within the area are further confused, imbedded, broken and crushed marble, quartzite, feldspathic quartzite, quartz, diorite, green conglomerates, phyllites, arguillites, grits, actinolite, chlorite, biotite, sericite, epidote, sphene, perthite, albite, garnet, hornblende, bytownites, fluorite, kyanite, hematite, pyrite, muscovite, serpentine, and many other forms of miner-

alization, along with quantities of gypsum in several different forms. The metamorphosis is so confused that even the common feldspar varies in soda content from place to place, so that it may be microcline, perthite or anti-perthite. An examination of the total evidence makes clear that the stratification sketch in evidence is merely a generalization and presents to the eye a gross oversimplification.

It can readily be seen from the foregoing that the trial court was entitled to believe that the area contained no real continuity as a vein or lode and was not contained within well-defined walls of igneous or other rock. While it was not binding on the court, it is also noteworthy that the maps placed in evidence show that the miners, in making locations, used the placer type location extensively in the nearby areas as well as in this area. We are satisfied that the trial court was fully warranted by the evidence in its finding.

PALEN MOUNTAIN PLACER CLAIMS NOS. 14-15-16

Defendants contend that their title to certain claims was put in issue by cross-complaint; that the dismissal of plaintiffs' second cause of action, which was the one relating to Palen Mountain Placer Claims 14, 15 and 16, could not deprive them of an adjudication of those portions of their claims which had overlapped said Palen Mountain Placer Claims 14, 15 and 16, but which were outside of the claims named in plaintiffs' first cause of action. Respondents, in their brief to this court, do not contest this assertion. The court made no finding as to the portions of defendants' claims above referred to.

An examination of Exhibits 63 to 65, inclusive, shows that of defendants' claims, a portion of the northeast corner of Contact No. 3, and a portion of the northwest corner of Contact No. 1, extend into the area covered by Palen Mountain Placer Claim No. 14; that most of the southwest portion of both Anhydride and Sheeptrail No. 1 overlap the area covered by Palen Mountain Placer Claim No. 15.

By their cross-complaint defendants claim title to said claims, Contact No. 1 and No. 3, Anhydride and Sheeptrail No. 1. By plaintiffs' answer to the cross-complaint they admitted that they claimed adversely to all of each of these claims. Defendants were thus entitled to a finding on the adverse contentions of the parties as to the portions of the said four claims which overlapped the area covered by said Palen Mountain Placer Claims No. 14 and No. 15.

.

The judgment is affirmed as to plaintiffs' claims Palen Gypsum Mines Nos. 1 to 13. The judgment is reversed as to those portions of defendants' claims which overlapped Palen Mountain Placer Claims No. 14 and No. 15. The trial court is directed to make such additional findings and judgment respecting the portions of defendants' Contact No. 1 and No. 3, Anhydride and Sheeptrail No. 1 as extend into the area covered by Palen Mountain Placer Claim No. 14 and No. 15 as it deems the evidence warrants. If the trial court finds it necessary, it may take additional evidence as to such portions.

Each of the parties hereto will bear his own costs on appeal.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied January 8, 1962, and appellants' petition for a hearing by the Supreme Court was denied February 7, 1962.