423 P.2d 104

**Arthur C. W. BOWEN, Appellant,**

v.

**CHEMI–COTE PERLITE CORPORATION, a corporation, Appellee.**[*]

**No. 2 CA–CIV 248.**

Court of Appeals of Arizona.

Jan. 24, 1967.

Rehearing Denied Feb. 27, 1967.
Review Granted June 20, 1967.

[*]This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8497. The matter was referred to this court pursuant to A.R.S. Section 12–120.23.

Engdahl, Jerman, Butler & Estep, by Dean Estep, Phoenix, for appellant.

Spector & Johnson, by R. E. Johnson, Phoenix, for appellee.

MOLLOY, Judge.

This is an appeal from a judgment rendered in favor of a lode mining claimant as against a placer mining claimant as to public lands belonging to the United States of America situated in Pinal County, Arizona. The contest involves two lode claims of approximately 20 acres each as opposed to two placer claims of approximately 160 acres each. The lode claims were located in 1944 under the names "Mary T" and "Sandy No. 2." The placer claims, which include the same areas as the lode claims and more land in the immediate area, were located in 1950 and 1954, respectively. The appellee, Chemi-Cote Perlite Corporation, hereinafter referred to as Chemi-Cote, is the successor in interest to the original lode claimants. The appellant, Bowen, is the successor in interest to the eight persons who originally located each of these placer claims.

As to each of the mining claims in question, the validity of the claim is based upon the discovery of perlite, a non-crystalline rock having a peculiar physical structure which has entrapped within it three to five per cent of water. When crushed and exposed to high temperatures, the rock expands and pops similar to popcorn to form a lightweight porous material with many uses.

The testimony at the trial below, without a jury, was directed entirely at the question of whether the mineral in question should be located as a lode or as a placer under applicable federal law. It was conceded by the opposing parties that all of the mining claims in contest, both placer and lode, had been properly located and were valid, provided that the discovery of the perlite in question was sufficient to support the particular type of claim made.

At the conclusion of the trial, the trial court found:

"1. That the mining claims known as 'Mary T' and 'Sandy No. 2' in Sections 8 and 9, Township 2 South, Range 12 East, Gila and Salt River Base and Meridian were validly located as lode claims in April, 1944, by plaintiff's predecessors in possession and with the knowledge of defendant Bowen.

"2. That plaintiff and its predecessors having [sic] been in continuous possession and performed necessary annual assessment work of the 'Mary T' and 'Sandy No. 2' mining claims since the date of the original location of same.

"3. That this is a possessory action and this Court has jurisdiction over the parties hereto and the subject matter, namely, the right of possession to said claims.

"4. That the right of possession of plaintiff to the 'Mary T' and 'Sandy No. 2' mining claims is superior to that of the defendants."

On the basis of these findings, the trial court entered judgment in favor of Chemi-Cote, quieting its title to the "right of possession" to the two lode mining claims in question, and denying Bowen judgment on his counterclaim to quiet his title to these mining claims and to recover damages for wrongful removal of ore therefrom.

DID THE LOWER COURT HAVE JURISDICTION OVER THE SUBJECT MATTER OF THE ACTION?

The first question raised on appeal is whether the lower court had jurisdiction of the subject matter of the suit. The appellant's contention that jurisdiction was lacking is based upon the fact that an application for patent had been filed by Bowen with the Bureau of Land Management prior to the commencement of the action below as to the two placer claims in question. This application was posted and published as required by applicable law, 30 U.S.C.A. § 29, and no adverse claim was filed by Chemi-Cote with the Land Office within the sixty days permitted by this law.

Bowen relies upon the decision of Warnekros v. Cowan, 13 Ariz. 42, 108 P. 238, 239 (1910), as establishing lack of jurisdiction. In *Warnekros* it was held that, when a lode mining claimant makes application for patent, and no adverse claim is filed by a conflicting lode mining claimant within the time permitted, a quiet title complaint, similar to that filed herein, should be dismissed for lack of jurisdiction in the lower court. Our Supreme Court said:

"Upon the filing of an application for patent to public mineral land, the jurisdiction of the Land Office becomes exclusive as to all questions affecting the title to the lands therein applied for, and so remains until the final determination of the application."

13 Ariz. at 45, 108 P. at 239.

"There is no allegation that the plaintiffs or either of them have filed an adverse claim therein. It appearing that the subject-matter of the action is within the exclusive jurisdiction of the Land Office, the demurrer to the jurisdiction of the trial court was properly sustained."

13 Ariz. at 47, 108 P. at 240.

█ The broad language of *Warnekros* finds support in encyclopedic law. 42 Am. Jur. Public Lands § 57, p. 835; 73 C.J.S. Public Lands § 186(a), pp. 847–848. However, there are well-established exceptions to this rule of exclusive jurisdiction in the Land Department in the area of possessory actions. Generally, it may be said that pending a determination of an issue in the Land Department, rights of temporary possession may be determined by a state court of competent jurisdiction. Hulsebus v. McConnell, 46 Ariz. 371, 51 P.2d 259 (1935); Northern Pacific Railroad Co. v. McComas, 250 U.S. 387, 39 S.Ct. 546, 63 L.Ed. 1049 (1919); Gauthier v. Morrison, 232 U.S. 452, 34 S.Ct. 384, 58 L.Ed. 680 (1914); 73 C.J.S. Public Lands § 186(a), p. 848; 42 Am.Jur. Public Lands § 70, p. 846. A general statement of this law is as follows:

"Also, prior to the time when the disposition of the land has passed from the control of the land department and pending a contest in the department, *the courts may and will protect the rights of the parties as far as this may be done without deciding the controversy before the department.*" (Emphasis added)

73 C.J.S. Public Lands § 186(a), p. 848.

In determining rights to possession of public lands, the state courts must necessarily construe federal statutes:

"In exercising jurisdiction to determine the possessory interests as between appellants and the irrigation district, the state court may be required to determine the mineral or non-mineral character of the land and the question of whether discovery has been made, where such a determination is necessary to settle the controversy before it. See McLemore v. Express Oil Co., 1910, 158 Cal. 559, 112 P. 59; Double Eagle Mining Co. v. Hubbard, 1910, 42 Cal.App. 39, 183 P. 282. We agree with the view of the California courts that it is not improper for state courts to make such a determination but such determination affects only the possessory interests of the litigants and has no effect upon the paramount title of the government. See Potter v. Randolph, 1899, 126 Cal. 458, 58 P. 905; Lightner Mining Co. v. Superior Court, 1910, 14 Cal.App. 642, 649, 112 P. 909."

Duguid v. Best, 291 F.2d 235, 239 (9th Cir. 1961).

To the extent that the validity of the Chemi-Cote lode claims was at issue in the patent application proceeding, under the above general law, it is arguable that any decision of the state court pertaining to rights of possession would only be temporary pending the final decision rendered in this regard by the Land Department. An example of such a decision holding that state court's jurisdiction to try possession will be limited to the determination of temporary possession until the final determination in the Department of the Interior is that of Perry v. Erling, 132 N.W.2d 889 (N.D.1965). In this regard, the North Dakota Supreme Court stated:

> *"The questions of whether the receiver's receipt should be cancelled or whether a patent should be issued* are wholly within the jurisdiction of the Department of the Interior of the United States and *are now at issue in a proceeding before the Secretary of the Interior.* This court is therefore without jurisdiction to make an adjudication that defendants Erling et al. have title. However, since the record shows that the defendants Erling et al. are in possession of the land under color of title, they are entitled to have that possession protected until the issue of title is decided by the Department of the Interior of the United States. They are therefore entitled to an injunction enjoining the plaintiff and the other defendants from interfering with that possession until such time as the issue of title is decided." (Emphasis added)

132 N.W.2d at 899.

However, we believe it to be equally clear from this general body of law that if the question of the validity of the Chemi-Cote lode claims was not at issue in the proceeding pending before the Land Department, then it was within the general jurisdiction of the state court to conclusively determine the validity of the Chemi-Cote lode claims as between the parties before it.

█ It should be noted the doctrine of recognizing exclusive jurisdiction in the Land Department as to controversies pending before it goes beyond the ordinary rules pertaining to the conflict of jurisdictions between courts in *in personam* and *in rem* actions. As to the former, no defect in jurisdiction is found unless "* * * the two actions present a substantial identity as to parties, subject matter, issues involved, and relief demanded." Allen v. Superior Court of Maricopa County, 86 Ariz. 205, 209, 344 P.2d 163 (1959); also see 20 Am.Jur.2d Courts §§ 128, 129, pp. 481–489, and 21 C.J.S. Courts § 492, p. 745. As to *in rem* or *quasi in rem* actions, the general law is that when a court takes into its possession or control a *res* involved in litigation, it exercises exclusive jurisdiction over that *res* and another court cannot interfere with such possession or control. 21 C.J.S. Courts § 495, p. 755; 20 Am.Jur.2d Courts § 133, p. 484. However, such jurisdiction is exclusive "* * * only insofar as exercise of this jurisdiction is necessary for the appropriate control and disposition of the property; the other court does not thereby lose its power to make orders which do not conflict with the authority of the court which has the control thereof." 20 Am.Jur.2d Courts § 133, p. 484; and see 21 C.J.S. Courts § 495, p. 757.

The reason for excluding courts of plenary jurisdiction from passing upon issues pending in the Land Department has been expressed thus:

> "If the courts could interfere with the action of the land department in cases before it for decision there would be an end to the orderly conduct of business in that department. And there might be presented the strange spectacle of two tribunals, at the same time, hearing and deciding the same case, arriving at opposite conclusions,—one tribunal, created especially for the purpose, and given jurisdiction and power to hear and decide the case; the other exercising an assumed jurisdiction, with no power or

authority to control the action or judgment of the former."

Aurora Hill Con. Min. Co. v. 85 Min. Co., 34 F. 515, 520 (Cir.Ct.Nev.1888).

If this be the reason for the rule, the rule should fail when the pending proceeding in the Land Department does not present the same issue as that sought to be tried to the state court.

■■ In understanding the problem at hand, we believe it is helpful to remember that the superior court of the State of Arizona is a court of general original jurisdiction. It has original jurisdiction of: "Cases and proceedings in which exclusive jurisdiction is not vested by law in another court." Ariz.Const., Article 6, Section 14, subd. 1, A.R.S. The Federal Land Department, under the Secretary of Interior, contrariwise, is a special tribunal exercising quasi-judicial powers, and as such its judicial powers are limited by the statutory provisions creating such powers. 42 Am. Jur. Public Lands §§ 57, 58, pp. 835–837; 73 C.J.S. Public Lands § 170, p. 829.

While the validity of Chemi-Cote lode claims was tried and decided in the state court action, we believe that the validity of these claims was not at issue in the placer patent application proceeding so that there was no reason for the state court to defer to the jurisdiction of the Land Department in this regard. The reason that the validity of the Chemi-Cote lode claims was not at issue in the placer patent application proceeding lies in the wording of pertinent federal statutes. Limiting the jurisdiction of the Land Department in this regard is the following statute:

"§ 37. Same; proceedings for patent

"Where the same person, association, or corporation is in possession of a placer claim, and also a vein or lode included within the boundaries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such case a patent shall issue for the placer claim, subject to the provisions of sections 21–

24, 26–30, 33–48, 50–52, 71–76 of this title, including such vein or lode, upon the payment of $5 per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim, or any placer claim not embracing any vein or lode claim, shall be paid for at the rate of $2.50 per acre, together with all costs of proceedings; *and where a vein or lode, such as is described in section 23 of this title, is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim;* but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof. R.S. § 2333." (Emphasis added)

30 U.S.C.A. § 37.

■ It is well-established law that the issuance of a federal patent to a placer claimant does not foreclose the question of whether there are known lode claims within the area of the placer patent. Iron Silver Mining Co. v. Mike & Starr Gold & Silver Mining Co., 143 U.S. 394, 12 S.Ct. 543, 36 L.Ed. 201 (1892); Noyes v. Mantle, 127 U.S. 348, 8 S.Ct. 1132, 32 L.Ed. 168 (1888); Reynolds v. Iron Silver Mining Co., 116 U.S. 687, 6 S.Ct. 601, 29 L.Ed. 774 (1886).

In part, this law is based upon the following reasoning expressed in Noyes v. Mantle, supra:

"The section [the portion of the above quoted section 37 pertaining to veins or lodes '* * * not known * * *' to exist] can have no application to lodes or veins within the boundaries of a placer claim which has been previously located under the laws of the United States, and are in possession of the locators or their assigns; for, as already

said, such locations, when perfected under the law, are the property of the locators, or parties to whom the locators have conveyed their interest. As said in Belk v. Meagher, 104 U.S. 279, 283, [26 L.Ed. 735]: '*A mining claim perfected under the law is property in the highest sense of that term, which may be brought, sold, and conveyed, and will pass by descent.*' It is not, therefore, subject to the disposal of the government. The section can apply only to lodes or veins not taken up and located so as to become the property of others. * * * A copy of the patent [to the placer claimant] is not in the record, so we cannot speak positively as to its contents; but it will be presumed to contain reservations of all veins or lodes known to exist, pursuant to the statute. *At any rate, as already stated, it could not convey property which had already passed to others. A patent of the government cannot, any more than a deed of an individual, transfer what the grantor does not possess.*" (Emphasis added)

8 S.Ct. at 1134–1135.

Further confirming that there are jurisdictional limits upon the Land Department, insofar as the issuing of placer patents subject to known lodes are concerned, are decisions holding that the Department cannot issue a patent adding to the statutory exclusion so as to exclude from a placer patent "*claimed* or known lodes." United States v. Iron Silver Min. Co., 128 U.S. 673, 9 S.Ct. 195, 32 L.Ed. 571 (1888); Crofoot v. Hill, 74 Nev. 173, 326 P.2d 417 (1958).

That we are in an area of a limitation upon the jurisdiction of the Land Department was recognized in an early Arizona decision:

"It is evident, it seems to us, from these various provisions of the statute, *that congress intended equally to take it out of the power of the land department in the one case to convey by patent even the legal title to veins or lodes known to exist within the boundaries of a placer claim,* and in the other known mines by patent obtained under a preemption entry." (Emphasis added)

Kansas City M. and M. Co. v. Clay, 3 Ariz. 326, 334, 29 P. 9, 12 (1892).

In old Dominion Copper Mining & Smelting Co. v. Haverly, 11 Ariz. 241, 90 P. 333 (1907), our Supreme Court carefully differentiated between the exclusive jurisdiction of the Land Department, which it held pertained in a contest between a homestead claimant and a lode mining claimant, as opposed to the situation presented here, that is, a contest between a lode claimant and a placer patent applicant. The court said:

"It will be observed that patents for town sites *and placer claims,* either expressly exclude in their terms any conveyance of title to the mineral lands in question, or are issued under a law that provides that, while they convey title to all other lands within their limits, they do not convey title to such mines, mineral lands, or mining claims. *The department does not take jurisdiction of the determination of these facts,* but issues the patents with these qualifications, and leaves the conditions that exist at the time of application and patent to be established, and the facts relative thereto to be determined, thereafter. It is proper, therefore, for the court, in a subsequent action, to determine just what any patent thus issued conveys, or what may, as a matter of fact be excluded from its conveyance, and while these cases are cited as exceptions to the rule, and are frequently designated as attacks upon the patent, they are not properly such." (Emphasis added)

11 Ariz. at 252–253, 90 P. at 338.

Decisions such as these have given rise to general statements in well-recognized treatises upon mining law that a lode claimant need not file adverse proceedings to a placer patent application:

"A placer must adverse a conflicting lode claim, or the lode applicant will take the full area of the claim. *A lode claimant need not adverse a placer claimant,*

as he may rely on the statutory exclusion of known lodes." (Emphasis added)

2 American Law of Mining § 9.14, pp. 324-325.

"A claimant to a known lode within a placer may, as a matter of expediency, adverse the application for the placer patent, and secure a segregation of his lode claim; *but a failure to do so will not prevent him from showing at any time that the lode was known to exist at the time the placer application was filed, and that under the law such lode never passed by the placer patent.*" (Emphasis added) 3 Lindley on Mines (3d ed.) § 720, p. 1763.

In order to understand the pertinency of this "known lode" exception, further facts must be detailed. In 1944, when the lode claims Mary T and Sandy No. 2 were laid out, Bowen performed the location work thereon as an employee of the locator. Bowen was an employee of Chemi-Cote for a short period in 1953, working on its perlite mill. Bowen himself filed two lode claims in the area now covered by the Superior Perlite No. 1 placer, these lode claims being located by him in 1944. Though the file of the Land Office pertaining to Bowen's placer patent application (Arizona 030706) contains facsimile copies of the two lode claims filed by Bowen in the area in question, his application contains no mention of the Chemi-Cote claims. The notice of Bowen's patent application was published nine times in the Superior Sun, a weekly newspaper of general circulation in Superior, Arizona, the nearest city of any size to the mining claims in question. The first publication was on September 21, 1961, and the last on November 16, 1961. The file of the Land Office indicates that the notice of application was posted at a point " * * * about 250 ft. N.E. of W ¼ marker Sec. 9," which would place the notice well outside the boundaries of the two lode claims in question. The record does not reflect any personal service upon Chemi-Cote, nor do the pertinent statutory provisions (30 U.S.C.A.

§§ 29, 30, 35) require such service of a placer patent application upon lode claimants within the area of the placer claims as to which patent is sought.

30 U.S.C.A. § 29, requires that an adverse claim be filed before " * * * the expiration of the sixty days of publication * * *." It was not until December 29, 1961, (43 days after the last publication) that Chemi-Cote filed with the Bureau of Land Management what it labeled as a "protest" to Bowen's patent application. This protest objected to the issuance of a patent to Bowen on three grounds: (1) that the publication of notice as required by 30 U.S.C.A. § 29 was deficient, (2) that any patent issued should exclude the lode claims of Chemi-Cote and (3) that the placer claims were excessively large and violated applicable statutory acreage limitations.

At the time of the trial in the lower court, there appears to have been no decision by the Land Office upon this protest, but subsequent to the trial a decision of the Department of Interior in Chemi-Cote Perlite Corporation v. Arthur C. W. Bowen, A-30404, 72 LD 403, was rendered on September 30, 1965. From this opinion it appears that on February 28, 1964, the Arizona Land Office dismissed the protest of Chemi-Cote, that this decision was affirmed on November 16, 1964, by the Office of Appeals and Hearings, Bureau of Land Management, and that this affirmance was approved by the Office of the Secretary of Interior in the opinion above cited. The reading of this opinion indicates that Chemi-Cote has never been afforded a hearing in the Land Department upon the merits of its contention that it has a valid known lode within the boundaries of the two placer claims under discussion here. The decision of the Land Department denying Chemi-Cote's contention that its lode claims should be excluded from any placer patents issued is predicated upon the statutory provisions requiring an adverse claim to be filed within the period of publication, and the provision that failure

to file an adverse claim shall constitute a waiver of any such claim. 30 U.S.C.A. § 30.

■■■ It was not contended below nor is it argued here that the decision of the Land Department, entered as a result of the Chemi-Cote "protest," is controlling as to the decision to be rendered in this action, either under the principle of *res judicata* or otherwise. The defense of *res judicata* is an affirmative defense and is waived unless raised by the party in whose favor it operates. 73 C.J.S. Public Lands § 179(d), p. 838; 30A Am.Jur. Judgments § 455, p. 500. Moreover, though decisions of the Land Department on factual issues are binding upon all other courts under the doctrine of *res judicata,* 73 C.J.S. Public Lands § 184(b), p. 844, 42 Am.Jur. Public Lands § 59, p. 837, it is generally held that decisions of the Office of the Secretary of Interior on legal questions are not conclusive upon other tribunals. 73 C.J.S. Public Lands § 184(c), p. 845; 42 Am.Jur. Public Lands § 59, p. 838. Hence, we do not consider the conclusion reached by the Land Department to be ·conclusively binding upon this court.

■■■ However, we recognize that under the general law cited above, opinions of the Office of the Secretary of Interior are entitled to great consideration and weight, and, differing as we do from the legal conclusions reached by the Land Department, we examine its opinion in some detail. In its opinion, the Office of the Secretary of Interior decided that " * * * a conflict between a lode claimant and a placer claimant is an adverse claim within the meaning of sections 2325 [30 U.S.C.A. § 29] and 2326 [30 U.S.C.A. § 30] of the Revised Statutes * * *." In support of its conclusion, the Land Department relied upon the following authority: Titanium Actynite Industries v. McLennan, 272 F.2d 667 (10th Cir. 1959); Ethelyndal v. McMullin et al., 62 I.D. 395 (1955); Cole v. Ralph, 252 U.S. 286, 295, 40 S.Ct. 321, 64 L.Ed. 567 (1920); San Francisco Chemical Co. v. Duffield, 201 F. 830 (8th Cir. 1912); Webb v. American Asphaltum Mining Co., 157 F. 203 (8th Cir. 1907).

The Land Department states that the decisions cited do not directly decide the question presented, but that by implication these decisions hold " * * * that a lode claimant asserting a right *to the same deposit* as a placer claimant cannot rely upon the 'known vein or lode' provisions * * *." (Emphasis added.) In effect, the opinion concedes that if the lode claimant were basing its claims upon a mineral deposit other that that which is the basis of the placer patent application, there would be no need to adverse. This, as we have seen, is the undoubted law. However, the Land Department would have the law to be that there is an exception to this exception, which would pertain to the special case when both placer and lode claimants rely upon the discovery of the same mineral to support the validity of their respective claims.

An examination of the decisions relied upon by the Land Department will disclose that they do not go beyond holding that it is proper for a court to determine, after an adverse claim has been made, whether particular mineral deposits are locatable as placer or as lode. In each of these cases the finding of the trial court on this issue was upheld. The decisions are explainable upon the premise that the "adverse" suits were filed in courts having jurisdiction over the parties and over the subject matter, and that the jurisdiction over the subject matter need not have arisen out of the statutory provisions pertaining to adverse suits.

In determining that the Land Department has wrongly conceived the law in this area, we are influenced by two considerations. The first is that the statutes in question do not purport to carve an exception from an exception. The provisions excepting known lodes from placer patents do not except those which are predicated upon the discovery of the same minerals as are made the basis of a placer claim. Applicable law provides categorically and in language which does not imply exception that:

"* * * an application for a patent for such placer claim which does not include

an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; * * *"

30 U.S.C.A. § 37.

██ Generally, "[w]here no exceptions are made to the general language of the statute, it will be presumed that no exceptions were intended; * * *." 82 C.J.S. Statutes § 316(b), p. 553. And see 50 Am. Jur. Statutes § 432, pp. 452–54. It occurs to this court that Chemi-Cote, if it had a valid known lode claim, should be safe in relying upon the above-quoted statutory provision and in declining to adverse the placer patent application in question.

We have already noted that the issuance of a placer patent does not foreclose the rights of known lode claimants. From this it seems to follow inexorably that the filing of an application for a placer patent does not in and of itself put in issue the question of whether there are known lodes within the area covered by the placer patent application. And if this is not in issue, we fail to see that the claims of a known lode claimant can be categorized as "adverse" to a placer patent application.

██ Secondly, and equally persuasive, is the failure to provide in this law for any reasonable notice to the prior lode claimant in the event that a placer claimant should select a previously known lode or vein as the basis for a placer patent application. As we have previously noted in the quotation from Noyes v. Mantle, supra, a mining location is recognized in this country to be property " * * * in the highest sense of that term * * *." To the same effect are Duguid v. Best, 291 F.2d 235 (9th Cir. 1961); Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935); Cole v. Ralph, 252 U.S. 286, 295, 40 S.Ct. 321, 325, 64 L.Ed. 567 (1920); and Belk v. Meagher, 104 U.S. 279, 14 Otto 279, 26 L.Ed. 735 (1881). Under fundamentals of due process, any tribunal conducting a hearing to determine that Chemi-Cote's mining location was invalid would be required to give it reasonable notice that its claims were in jeopardy and an opportunity to be heard:

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

██ We realize that in this particular case there is no showing that Chemi-Cote did not have actual notice that Bowen's placer claims were based upon discovery of the same type of mineral which formed the predicate for Chemi-Cote's lode claims. However, we are concerned with the meaning of statutory language, as that language applies to all claimants. The statutes in question must be interpreted in such a manner as to apply to the myriad of situations which will be presented thereunder, and, when there is an ambiguity, the statutory language should be construed compatibly with constitutional mandates. Mendelsohn v. Superior Court, 76 Ariz. 163, 261 P.2d 983 (1953); Elizabeth Arden, Inc. v. Federal Trade Com., 2 Cir., 156 F.2d 132, cert. denied 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828 (1947). We believe that there is no particularly high degree of probability that a lode claimant will ordinarily be apprised that a placer patent applicant is basing his claims upon the very same mineral that is the subject of a lode claim.

Even in the instant situation, there is ample room to conclude that such knowledge was not actually brought home to Chemi-Cote. The discovery pits and the monuments of the Bowen placer claims were all located outside of the Chemi-Cote lode claims. There is considerable alluvial material on the land in question which might support placer claims. Even if it be assumed that Chemi-Cote knew that Bowen's placer claims were predicated upon the dis-

covery of the very same bed of perlite as formed the basis for its lode claims, we see no method embodied in the patent procedure by which Chemi-Cote was put on reasonable notice that Bowen was not conclusively declaring that he had no rights in these lode claims, of whose existence and boundaries he knew so well, by failing to mention them in his patent application.

If Bowen had wished to contest the validity of the Chemi-Cote claims in the Department of Interior, there was a special procedure which he could have followed, which would have resulted in personal service of his contentions upon Chemi-Cote.[1] We conclude that the plain meaning of the statutes in question should not be engrafted with the exception to the exception urged by Bowen, which would make them violative of basic due process concepts.

The Land Department opinion, supra, relies also upon the decision of Dahl v. Raunheim, 132 U.S. 260, 10 S.Ct. 74, 33 L.Ed. 324 (1889), which holds:

"That it was placer ground is conclusively established, in this controversy, against the defendant [lode mining claimant], by the fact that no adverse claim was asserted by him to the plaintiff's application for a patent of the premises as such ground."

10 S.Ct. at 75.

However, *Dahl* expressly recognized the exception of the known lode. The following discussion of *Dahl* in Lindley's treatise makes this clear:

"That the court did not intend to decide that a lode claimant must adverse a placer application or be precluded from showing subsequently that the lode was known to exist at the time the placer application was filed, is manifest from its language in another portion of the opinion. 'The only position upon which the defendant (the lode claimant) can resist the pretentions of the plaintiff is, that the placer ground, for a patent of which he applied, does not embrace the lode claim.' That is, that the lode was known to exist within the limits of the placer ground prior to the filing of the placer application, and therefore did not pass by the placer patent. This view harmonizes with the later decisions of the same court."

3 Lindley on Mines (3d ed.) § 720, p. 1763.

Though the patent proceeding may conclusively establish that these placer claims cover "placer ground," it does not follow that there is a conclusive establishment that any particular portion of the placer claims in question is not a lode or a vein. With the exception of the extralateral rights of lode claimants, mining claims and patents issued in regard thereto pertain to intraliminal rights, not to particular minerals or ores. 58 C.J.S. Mines and Minerals § 60, pp. 113–114; 58 C.J.S. Mines and Minerals § 114(b), p. 171; 36 Am.Jur. Mines and Minerals § 107, p. 356; 36 Am.Jur. Mines and Minerals § 122, pp. 369–70.

Accordingly, we hold that the pendency of the patent application did not deprive the trial court of jurisdiction to determine the rights to the possession of the Chemi-Cote lode claims and to try the claim for damages for trespass brought by Bowen.

### IS THE PRIOR POSSESSION OF CHEMI-COTE CONCLUSIVE OF THIS ACTION?

Chemi-Cote contends that because it has been in possession of its lode claims since 1944, it is immaterial whether it had discovered valuable mineral in a vein or lode of rock in place. It relies upon decisions such as Woolsey v. Lassen, 91 Ariz. 229, 371 P.2d 587 (1962), and Bagg v. New Jersey Loan Company, 88 Ariz. 182, 354 P.2d 40

---

1. Regulations of the Land Department provide for a method of a private contest to a mining claim. See 43 C.F.R. 1852.1 et seq. Such regulations provide for personal service of the contest upon each contestee, 43 C.F.R. 1852.1–5. The validity of such a contest procedure is recognized in Duguid v. Best, 291 F.2d 235 (9th Cir. 1961).

(1960). The substance of these holdings is as stated in *Bagg*:

"In an action to attain possession of a claim, the possession of which has resided with the adverse party for some time, the claimant may not recover, although the adverse party's title or right to possession is defective, unless the claimant can show a superior right to possession in himself."

88 Ariz. at 189, 354 P.2d at 45.

We distinguish the *Bagg* and similar decisions by reason of the pending patent application by Bowen and the failure to adverse same.

■■■ Acts of Congress are a portion of "* * * the supreme Law of the Land * * *" which our courts are bound to enforce. Constitution of the United States, Article VI, Clause 2. Applicable federal law provides in part:

"It shall be the duty of the adverse claimant, within thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction, to determine *the question of the right of possession,* and prosecute the same with reasonable diligence to final judgment; and a *failure so to do shall be a waiver of his adverse claim.*" (Emphasis added)

30 U.S.C.A. § 30.

■■■ This language, together with other language contained within 30 U.S.C.A. §§ 29 and 30, indicates clearly that adverse claims are concerned with possessory rights and that unless appropriate adverse proceedings are filed, such possessory rights are lost. As is made crystal clear in *Bagg*, that decision was determined by possessory rights: "[t]hough frequently referred to as such in the briefs, this action clearly is not one to quiet title in the ordinary sense; it is a possessory action." 88 Ariz. at 188, 354 P.2d at 44.

That "adverse" rights include "possessory" rights is indicated by the basic nature of "adverse" proceedings:

"An adverse claim consists of some right, or alleged right, to all or a portion of the surface ground of a mining claim sought to be patented by another * * * *it is essentially one to determine the right of possession to the whole or a part of the surface area described in the application for patent.* As both claimants derive title from a common source, the United States, *the only question in such proceeding is superiority of title and the consequent right of possession,* a matter that must always be tried to the courts." (Emphasis added)

2 American Law of Mining § 9.13, pp. 321–22.

If possessory rights are not lost by failing to adverse, it is difficult to conceive what rights are lost, inasmuch as title to the property itself lies in the United States, and is not subject to being determined in the state court. Bagg v. New Jersey Loan Company, supra; Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 24 S.Ct. 632, 637, 48 L.Ed. 944 (1904).

*Bagg* points out by a quotation from American Mining Law, Fourth Edition (edited by A. H. Ricketts), Vol. 1, § 382, that a "possessory action" differs from an "adverse suit" in that:

"'* * * in an adverse suit the judgment therein affects the *title to the ground* in dispute as between the parties thereto *and the government* and the judgment in a possessory action affects only the *title to the ground* as between parties litigant.'" (Emphasis added)

88 Ariz. at 188, 354 P.2d at 44.

■■■ That "possessory rights" and "title" are not two completely distinct concepts is evidenced by the fact that prior possession alone, in the absence of a better right, is sufficient "title" to support a quiet title action. 74 C.J.S. Quieting Title § 18, p. 43; 44 Am.Jur. Quieting Title § 44, p. 37. In this action, Chemi-Cote was faced with something superior to naked possession, in that Bowen, if his claims were valid, could also be said to be in possession of the land in dispute, and if Chemi-Cote's possessory rights, under the pertinent law, had been

lost by failing to adverse Bowen's patent proceedings, Chemi-Cote's rights would be inferior to those of Bowen's. In mining law, the right to possession is inextricably related to whether a valid mining location has been made:

"The right to the possession comes only from a valid location. Consequently, if there is no location there can be no possession under it. Location does not, necessarily, follow from possession, but possession from location."

Belk v. Meagher, 104 U.S. 279, 14 Otto 279, 26 L.Ed. 735, 737 (1881).

 We hold that the mere fact that Chemi-Cote was in prior possession of the subject claims is not determinative of the instant action. Unless Chemi-Cote's lode claims were valid by reason of the discovery of valuable mineral in a vein or lode of rock in place, we conclude that the exception of the "known lode" would be non-applicable, and that the express waiver of rights provisions in §§ 29 and 30, 30 U.S. C.A., would be pertinent. Crofoot v. Hill, 74 Nev. 173, 326 P.2d 417 (1958); Cole v. Ralph, 252 U.S. 286, 40 S.Ct. 321, 64 L.Ed. 567 (1920).

## DID CHEMI-COTE HAVE A VALID KNOWN LODE?

We now proceed to the question tried in the lower court as to whether the lode claims of Chemi-Cote were invalid because of the nature of the valuable mineral discovered.

It is accepted by both parties on appeal that the discovery of a vein or lode of rock in place will not support a placer location and that the finding of placer material containing valuable mineral will not support a lode claim. Cole v. Ralph, 252 U.S. 286, 40 S.Ct. 321, 64 L.Ed. 567 (1920).

Pertinent portions of federal statutes read:

"§ 23. Length of claims on veins or lodes

"Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, * * *."
30 U.S.C.A. § 23.

"§ 35. Placer claims conforming entry to legal subdivisions and surveys; limitation of claims

"Claims usually called 'placers,' including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims; * * *."
30 U.S.C.A. § 35.

 Two of the most quoted judicial definitions of veins or lodes derived from these statutes are as follows:

"It is difficult to give any definition of the term as understood and used in the acts of congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode, in the judgment of geologists. But to the practical miner, the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock lying within any other well-defined boundaries on the earth's surface and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term as used in the acts of congress is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock."

Eureka Consolidated Min. Co. v. Richmond Min. Co., 8 Fed.Cas. p. 819, No. 4,548, 4 Sawy. 302 (1881), aff'd 103 U.S. 839, 26 L.Ed. 557 (1881).

"To determine whether a lode or vein exists it is necessary to define those terms; and, as to that, it is enough to say that a lode or vein is a body of mineral or mineral-bearing rock, within defined

boundaries in the general mass of the mountain. In this definition the elements are the body of mineral or mineral-bearing rock and the boundaries; with either of these things well established very slight evidence may be accepted as to the existence of the other. *A body of mineral or mineral-bearing rock in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such body, and to the extent of it, boundaries are implied.* On the other hand, with well-defined boundaries, very slight evidence of ore within such boundaries, will prove the existence of a lode." (Emphasis added) Iron Silver Min. Co. v. Cheesman, 116 U.S. 529, 536, 6 S.Ct. 481, 484, 29 L.Ed. 712 (1886).

Rummell v. Bailey, 7 Utah 2d 137, 320 P. 2d 653 (1958), postulates that the word "lode" is a variation of the word "lead" and that included within the term is any:

"* * * mineralization in place * *, as distinguished from float or imported material, * * * of such significance that a practical, experienced miner of prudence and judgment would deem it advisable to pursue the vein or 'lead' thus furnished and to expend further time, effort or money in attempting to develop the property as a mine."

320 P.2d at 656–657.

Additional facts are necessary to apply this general law to this case. For the most part, the evidence pertaining to the nature of this deposit is undisputed. Perlite is a non-crystalline variation of the rock rhyo-lite and is of igneous origin. Perlite, in the general area of these claims, lies in a bed which is exposed in places by erosion, but for the most part is covered by a thin layer of rocky material consisting of non-perlitic rhyolite, dacite, pumice, volcanic breccia and ash, and alluvial material. The area of the bed was variously described as covering between four and five square miles or, as described in the patent application of Bowen, as covering an area "* * approximately two thousand feet North and South and the same East and West." The source of the perlite is a volcanic vent in the underlying sedimentary rock underneath Picket Post Mountain, at the base of which volcanic uprising the bed of perlite in question lies. The perlitic rhyolite in question rose in this vent and spread to the east of its source, coming to rest in a bed generally parallel with the surface, which is gently sloping to the northeast. The non-perlitic rhyolite and the other material covering the perlite bed is distinguishable in appearance from the perlite which is the basis of these conflicting claims. The perlite as it lies in the ground is a "hard rock," and the mining thereof is a "hard rock mining operation." The depth of the bed of perlite is not definitely established, but there is evidence in the record from which the court could have found that the depth of the perlite in the area of the Mary T lode claim was approximately fifty feet, that it was of lesser depth in the Sandy No. 2 claim to the east, and that the shape of the entire bed of perlite was thin in comparison to the broad area over which it extended.[2]

2. The following excerpts from the transcript are illustrative of this evidence (from the testimony of Hale Tognoni, mining engineer, geological engineer and lawyer specializing in mining law):
"Well, the perlite is a phase of the flow of these acidic flows from Picket Post. Evidentally [sic] we are out on the eastern lip of the old crater and that flow came over the top of, I think, ash, volcanic ash, * * * but it seems to actually lay upon an ash flow itself and it looks as if that particular flow came down an old—along an old erosional surface and it's natural to presume that when you are having a flow out of a vent that it will seek the lowest spots. * * *

 * * · * * *

"Well, the flow situation is just like water flowing out. The speed of a flow of course will depend upon the viscosity

All witnesses agreed that there had been a rocky covering over the perlite which had been weathered and eroded considerably over the geologic time since its original deposit by volcanic action. All agreed that perlite as removed from the earth has no commercial or industrial use and that it must be crushed, screened, and put into a kiln to be "popped" by high temperatures before it has any use. After being so processed, it can be used as insulation, fabricated into building blocks by the use of cement or other bonding material, used as a filter aid, and in perhaps forty other ways. The perlite in this particular bed was of different grades in various areas, with the grade of perlite on the claims in question being of the better or best quality.

The fact that the subject bed of perlite lies more or less horizontally, and not in a more vertical plane, as is the more common occurrence of a vein or lode, we believe to be not of the essence:

"Generally speaking, deposits of broken, loose, or scattered material are to be located as placers, while deposits in the form of veins, *including banket veins,* if they constitute 'rock in place' are locatable as lodes." (Emphasis added)

1 American Law of Mining § 520, p. 763.

"Hence, wide bed-like formations commonly known as blanket veins, while otherwise valid as lode locations, carry no extralateral rights."

2 American Law of Mining § 617, p. 42.

of the material. Now, within this pit there is definite flow structures—horizontal lines.

\* \* \* \* \*

"No, it's a flow over the surface. Of course as you move over to and come to the place where the lip of the crater was you are going to have it bending down *but it will not go very deep.* It will be—because of the problem that once you get down at a very great depth you are going to have a greater time of cooling and it's going to change into a different type rock.

\* \* \* \* \*

"Well, the perlite at the present time is in this—you can examine it and see this flow structure within it, the horizontal flow structure, as you go down to the—through the bottom there you will find glassy stage of it.

\* \* \* \* \*

" \* \* \* As you go up the hill there you will find this denser glassy rhyolite which is of almost exactly the same chemical composition as the perlite except for the fact that this has minerals within it while the perlite does not have the crystal structures within the minerals within it \* \* \*.

\* \* \* \* \*

"Number three [Exhibit 3 in evidence —a photograph of "south pit" on the "Mary T"] is at the bottom of the pit. Shows the glassier materials coming in and again a change within the facies of the perlite itself. And this is a more glassy material than the materials above it there."

\* \* \* \* \*

"Well, this particular perlite flowed out from the hill to the west across the intersection right in the area—the field of the old stream and then out across the hills to the valley to the east and of course that area becomes— is one *long lip end of a flow* and so you have, as I picture it, *almost like your hand going out there,* the bigger portion of the flow coming out from the end of it, or the edge of the volcano and then fingering out into the valley as it *became thinner and thinner to the east.*

\* \* \* \* \*

" \* \* \* Now, the perlite itself, the present perlite pits, this being all perlite that shows—I got that a little deep here. This perlite is probably down in here more and the present pits are in here actually in perlite and they—*the perlite goes out, undershows in the bottom of this bed,* \* \* \*.

[An examination of a sketch drawn by this witness of the perlitic flow, Exhibit N in evidence, indicates that this witness at this point was expressing the opinion that the bottom of the perlite was exposed in the open pit on the Mary T lode claim at a depth of approximately fifty feet.]

" \* \* \* And how much is under here is problematical but as you come out and walk up and down this particular canyon you run into ash on the south end and ash on the north end showing that there is probably—*there is a layer of ash material underneath this—underneath the perlite.*" (Emphasis added)

The following are examples of decisions upholding veins or lodes lying in a substantially horizontal blanket: San Francisco Chemical Co. v. Duffield, 201 F. 830 (8th Cir. 1912); Iron Silver Min. Co. v. Mike & Starr Gold & Silver Min. Co., 143 U.S. 394, 430, 12 S.Ct. 543, 36 L.Ed. 201, 214 (1892); Iron Silver Min. Co. v. Campbell, 17 Colo. 267, 29 P. 513 (1892); Duggan v. Davey, 4 Dak. 110, 26 N.W. 887 (1886).

In the *Mike & Starr Gold & Silver Mining* case, the court was concerned with:

"* * * a body of mineral underlying a large area of country in the Leadville mining district, whose general horizontal direction together with the sedimentary character of the superior rock, indicated something more of the nature of a deposit like a coal bed than of the vertical and descending fissure vein in which silver and gold are ordinarily found * * *." 12 S.Ct. at 544.

Pronouncements of the United States Supreme Court indicate that placer claims should be limited to "softer" material:

"Placer mines, though said by statute to include all of the deposits of mineral matter, are those in which this mineral is generally found in the softer material which covers the earth's surface, and not among the rocks beneath."

Reynolds v. Iron S. M. Co., 116 U.S. 687, 6 S.Ct. 601, 605, 29 L.Ed. 774 (1886).

"By the term 'placer claim,' as here used, is meant ground within defined boundaries which contain mineral in its earth, sand, or gravel; ground that includes valuable deposits not in place, that is, not fixed in rock, but which are in a loose state, and may in most cases be collected by washing or amalgamation without milling. By 'veins or lodes,' as here used, are meant lines or aggregations of metal embedded in quartz or other rock in place."

United States v. Iron Silver Min. Co., 128 U.S. 673, 9 S.Ct. 195, 197, 32 L.Ed. 571 (1888).

"* * * placers are merely superficial deposits, occupying the beds of ancient rivers or valleys, washed down from some vein or lode * * *"

North Pacific Railroad Co. v. Soderberg, 188 U.S. 526, 23 S.Ct. 365, 367, 47 L.Ed. 575 (1903).

And see Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 24 S.Ct. 632, 635, 48 L.Ed. 944 (1904); and Cole v. Ralph, 252 U.S. 286, 40 S.Ct. 321, 326, 64 L.Ed. 567 (1920). Also see Fuller v. Mountain Sculpture, 6 Utah 2d 385, 314 P.2d 842, 844 (1957), for a more modern pronouncement of similar import.

In 1892[3] Congress adopted the Stone Act which in its present form and insofar as pertinent to our problem reads:

"Any person authorized to enter lands under the mining laws of the United States *may* enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer-mineral claims. (Emphasis added) 30 U.S.C.A. § 161.

There is testimony in the court below that the passage of this Act caused some change in the thinking of those involved in the mining industry as to whether "hard rock" might be located as placer. It is to be noted that the statute is permissive ("may"), and unless one accepts the premise that there is relentless dichotomy between placer and lode, it would not necessarily follow from the statute that building stone could not be located as a lode, if it appeared in the earth's crust in that form.

One of the witnesses who testified below, with many years of experience in the mining industry, was of the opinion that the subject rock was locatable under this Stone Act. We believe the law to be otherwise. In Dunbar Lime Co. v. Utah-Idaho Sugar Co., 17 F.2d 351 (8th Cir. 1926), the court was faced with the problem of whether calcite, a mineral valuable as a flux in smelting, for clarifying sugar, and

---

3. Act of August 4, 1892, Ch. 375.

in making Portland cement and white plaster should be located under the Stone Act of 1892.

The Eighth Circuit Court of Appeals in affirming the trial court's holding that the Stone Act was not applicable stated:

"The fact that the calcite might be used in making artificial stone for building purposes or as an ingredient in making Portland cement and white plaster, as found by the court, does not make the same building stone within the meaning of the act of 1892."

17 F.2d at 356.

■ We know of no contrary authority and are of the opinion that the perlite in question, which is not used as "building stone" in the ordinary sense of the word, is not covered by the Act of 1892.

■ It is well-established law that non-metalliferous deposits, such as the perlite in question, are locatable as lodes when they appear in appropriate form:

"The idea that nonmetallic minerals were excluded from lode locations because only metallic minerals were mentioned by name in the statute was laid to rest in Webb v. American Asphaltum Mining Co. [157 Fed. 203 (8th Cir. 1907)], where gilsonite, a petroleum type of mineral was held to be locatable as a lode, if the lode characteristics were present. Thereafter, deposits of calcium phosphate in Wyoming and Idaho were held to be lodes were [sic] circumscribed within the general mass of the mountain. [San Francisco Chemical Co. v. Duffield, 201 Fed. 830 (8th Cir. 1912); Duffield v. San Francisco Chemical Co., 205 Fed. 480 (9th Cir. 1913)]." 1 American Law of Mining § 5. 10, p. 741.

■ The width of this particular vein, which the court might have found under the evidence to be not substantially more than fifty feet, is no obstacle to this deposit being regarded as a lode. It is to be noted that the applicable statute makes no limitation as to the width of the lode. In McMullin v. Magnuson, 102 Colo. 230, 78 P.2d

964 (1938), pegmatite, a rock containing feldspar, a valuable nonmetallic substance which occurred in a formation 300 to 600 feet in width was held to be properly located as a lode.

Nor does the statute (30 U.S.C.A. § 23) provide that the length and depth of the vein must have ascertained limits. The typical situation in the case of the more vertical veins is that the length and depth thereof is unknown. That the exact boundaries of the subject horizontal lode in relation to the earth's surface are not established can certainly not be a defeating factor to the validity of these claims.

It is argued that a lode claim here is not proper because, if this perlite is in the form of a vein or lode, it is valuable throughout the vein or lode and therefore does not match the statutory description of " * * * veins or lodes * * * *bearing* * * * valuable deposits * * *." (Emphasis added.) 30 U.S.C.A. § 23.

Lindley, a venerable publicist in this area of law, at one point in his treatise suggests that a lode or vein to be locatable as such cannot be solid or semi-solid valuable mineral itself, but must contain within itself, segregated in some unspecified way, val·· uable mineral:

"Deposits of this character [limestone used in fluxing, sandstone, slate, marble and granite], although essentially in place, are locatable under the placer laws if they do not contain other mineral or valuable deposits. They are considered the 'rock in place,' but not a 'vein or lode of quartz or other rock in place bearing gold * * * or other valuable deposits.' "

2 Lindley on Mines § 421, p. 991 (3d ed.).

The only authorities given by Lindley, to support the above statement, are: Roy McDonald, et al., 40 LD 7 (1911), and Henderson, et al. v. Fulton, 35 LD 652 (1907). These decisions we believe to be in conflict with the decisions of San Francisco Chemical Co. v. Duffield, 201 F. 830 (8th Cir. 1912), and Webb v. American Asphaltum Mining Co., 157 F. 203 (8th Cir. 1907),

with which decisions Lindley has no quarrel (see 2 Lindley on Mines § 425(A), pp. 999–1005 (3d ed.)), and which decisions we choose to follow. In other areas of his treatise, Lindley appears to recognize that "marble, borax, onyx, asphaltum, gilsonite, unitaite (a species of asphaltum), gypsum, talc, graphite, rock phosphates, chalk, marls, oil-stones, mica, asbestos, fluorspar, sulphur, and mineral paint" when occurring in veins which occupy a " * * * vertical or pronounced inclined position in the mass of the mountain" should be located as lodes, while if they lie in horizontal deposits they should be located as placers. See 2 Lindley on Mines § 323, pp. 736–37 (3d ed.). The distinction between a semi-horizontal vein and one which takes on a more vertical position in relation to the surface of the earth does not appeal to this court nor do we believe it to be one accepted by the weight of authority.

Lindley's solution to the ambiguity presented in the American Asphaltum Mining Co., and San Francisco Chemical Co. v. Duffield cases, supra, is to recognize the rights of the original discoverer who has acted in good faith, regardless of whether he locates as a lode or as a placer:

> "The first locator locating as a lode would, of course, hold his claim as against a later locator seeking to challenge the first locator's classification by locating as a placer. There are no equities in favor of the second comer."

2 Lindley on Mines § 425(B), p. 1005 (3d ed.).

This view that a good faith location should be protected if the lode versus placer situation is ambiguous, is suggested by more modern authority:

> "A locator who makes a good faith location in reliance upon past practice should be protected regardless of the court's view as to what might have been the most appropriate form of location."

1 American Law of Mining § 5.20, p. 764.

If the trial court needed further support for its decision that the subject perlite was locatable as a lode, we find it in this concept of good faith. The following statement from Rummell v. Bailey, 7 Utah 2d 137, 320 P.2d 653, 656 (1958), is deemed pertinent:

> "The statute requiring discovery of the 'vein or lode' within the claim must be construed in accordance with its purpose which is to foster and encourage the discovery and development of mineral resources by providing a practical method of procedure for those who in good faith desire to search out and develop such resources in the public domain. To this end the courts have been quite liberal in sustaining discoveries in favor of the first locator of a mining property. This is particularly so where the issue arises between him and another prospector who subsequently attempts to claim the same property."

320 P.2d at 656.

Bowen relies on the decisions of Pepperdine v. Keys, 198 Cal.App.2d 25, 17 Cal. Rptr. 709 (1962), and Titanium Actynite Industries v. McLennan, 272 F.2d 667 (10th Cir. 1959), to support his contention that the trial court could not regard the layer of perlitic rhyolite in question to be a vein or a lode. The *Titanium* decision is concerned with the contention that a mass of magnatite-perovskite was in a vein or lode formation. The valuable mineral was contained in both the alluvial material on top and the harder rock below over an area of between eight to twelve square miles. The lack of a segregating boundary between the valuable ore and the surrounding rock seems to have been well established:

> "While it is true that the higher mineral segregations were fixed in place in the pyroxinite, the evidence discloses that even assay tests could indicate no ascertainable boundaries setting them apart from the general mass. The bodies of higher mineral content were irregular in shape and lacked continuity so that extreme difficulty would be encountered in

attempting to trace them, even if selective mining methods were advisable."

272 F.2d at 673.

On appeal the court concluded:

"Under these circumstances, the trial court's findings that there were no veins or lodes in the area in question were not clearly erroneous and 'the theory that the whole mass can be called a lode or a vein and be located as a lode mining claim on that basis' is not tenable under the facts of this case."

272 F.2d at 673.

That there was a similar lack of boundaries in the *Pepperdine* decision is demonstrated by the following quotation:

" * * * the evidence shows that the trial court was fully justified in believing that in the area here involved, a gypsum deposit covered about five square miles; that the formation involved an intricate folding, faulting, brecciation, metasomatic and hydro-thermal metamorphism, cataclastic deformation and igneous intrusion, presenting a picture of extreme complexity, probably deposited originally by marine dehydration under arid conditions in a broad shallow basin of a continental platform. Within the area are further confused, imbedded, broken and crushed marble, quartzite feldspathic quartzite, quartz, diorite, green conglomerates, phyllites, arguillites, grits, actinolite, chlorite, biotite, sericite, epidote, sphene, perthite, albite, garnet, hornblende, bytownites, fluorite, kyanite, hematite, pyrite, muscovite, serpentine, and many other forms of mineralization, along with quantities of gypsum in several different forms. The metamorphosis is so confused that even the common feldspar varies in soda content from place to place, so that it may be microcline, perthite or anti-perthite. An examination of the total evidence makes clear that the stratification sketch in evidence is merely a generalization and presents to the eye a gross oversimplification.

"It can readily be seen from the foregoing that the trial court was entitled to believe that the area contained no real continuity as a vein or lode and was not contained within well defined walls of igneous rock."

17 Cal.Rptr. at 715.

■ Contrariwise, in the instant case, the evidence presents a simple picture of there being a continuous body of perlitic rhyolite in the shape of a "lip" or a "hand," all coming from a common igneous source, and segregated in physical appearance from both the overlying volcanic deposits and, at some undeterminate depth, "not too deep," from other underlying volcanic deposits. There is no evidence that this layer of perlitic rhyolite has been so metamorphosized as to be difficult to follow by ordinary mining methods. The deposit in question is well within the definition of a vein or lode given in the *Titanium* decision:

"However, the boundaries or walls do not have to be visually discernible, but instead can be established by assay analysis. Hyman v. Wheeler, C.C.Colo., 29 F. 347; Beals v. Cone, 27 Colo. 473, 62 P. 948; Lindley on Mines, Vol. 1, 3d Ed. § 294. The country rock need not be totally barren of minerals, but the mineral content of a lode must be appreciably greater than that of the surrounding rock. Grand Central Min. Co. v. Mammoth Min. Co., 29 Utah 490, 83 P. 648. A lode usually is said to exist where the body of mineral-bearing rock has such continuity and apartness that it can be traced in the general enclosing mass. Hyman v. Wheeler, supra; Eureka Consolidated Min. Co. v. Richmond Min. Co., C.C.Nev., [4 Sawy. 302, 8] Fed.Cas. [p. 819,] No. 4,548, affirmed 103 U.S. 839, 26 L.Ed. 557."

272 F.2d at 671.

■ Throughout the foregoing opinion we have resolved the few conflicts in the evidence in the light favorable to supporting the judgment of the trial court. This we believe we were bound to do. Babnick

v. Babnick, 94 Ariz. 338, 385 P.2d 216 (1963); Deuel v. McCollum, 1 Ariz.App. 188, 400 P.2d 859 (1965). In this connection, Bowen has placed considerable reliance in this appeal upon a portion of a minute entry made by the trial court entered on March 5, 1964, some ten weeks prior to the signing of the final written judgment by the court, the findings of which judgment have been previously quoted herein. In the minute order of March 5, 1964, the trial court stated, in part:

" * * * that it was the general belief among the pioneers in the industry that a lode location was the proper method of determining the boundaries of said claims; that the plaintiff did make this location in good faith and has been itself or by its predecessors in continuous possession since the date of original location. In the event the Court were to determine the action based upon the knowledge or customs as of this date it would undoubtedly hold that same should properly be located as placer claims; * * *."

It is difficult to know the reasoning behind the court's statement pertaining to the propriety of placer claims. As previously pointed out, there was expert testimony that perlite should be located under the Stone Act of 1892, and a publication of the Department of Mineral Resources of the State of Arizona, revised in 1951, which stated that: "Perlite deposits may be safely and legally located as placer claims under the Act of August 4, 1892," was called to the court's attention.

Whatever the court's reasons for the foregoing statement, we believe it to be of no moment, for we have a written judgment signed by the court at a later date, which has its own findings of fact, previously quoted herein, upholding without qualification[4] the validity of the Chemi-Cote lode claims. We believe it to be well-established law that the minute entry order is superseded by the written judgment and

that it is only with the latter that we are concerned on appeal. Stock Growers Finance Corporation v. Hildreth, 30 Ariz. 505, 249 P. 71 (1926); Brown v. Peterson, 27 Ariz. 418, 233 P. 895 (1925); McFadden v. McFadden, 22 Ariz. 246, 196 P. 452 (1921).

Judgment affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.

---

4. The findings read, in part: "That the mining claims known as 'Mary T' and 'Sandy No. 2' * * * were validly located as lode claims in April, 1944, by plaintiff's predecessors * * *."